John DOE, Plaintiff,

v.

**FEDERAL BUREAU OF INVESTIGATION, et al., Defendants.**

Civ. A. No. 88–2350.

United States District Court, District of Columbia.

July 21, 1989.

Mitchell Rogovin and William A. Isaacson, Rogovin, Huge & Schiller, Washington, D.C., for plaintiff.

Edith S. Marshall, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

The Privacy Act, 5 U.S.C. § 552a, was enacted in part as a response to "intelligence gathering activities that violated basic privacy rights [which] were prompted by the rash of civil disturbances and racial and political unrest on college campuses." H.Rep. No. 1416, 93rd Cong., 2d Sess. 5–6 (1974), U.S.Code Cong. & Admin.News 1974, p. 6919. Although initiated nearly fifteen years after passage of the Act, this suit requires the Court to revisit that painful and difficult time in our national history. Plaintiff John Doe, who by his own admission was considerably involved in political activity in the late 1960s and early 1970s, was denied appointment to a high-level position within the federal government in 1986.[1] Alleging that the denial was caused by inaccurate records of his political endeavors, Doe brought this Privacy Act suit seeking expungement of the records and damages for injuries resulting from their dissemination. Presently pending before the Court is plaintiff's motion for partial summary judgment and defendants' motion to dismiss or, in the alternative, for summary judgment. For the reasons articulated below, these motions shall be granted in part and denied in part.

## I. Background

John Doe is a physician who began working as a consultant to the Chicago regional office of the Social Security Administration (SSA), a component of the Department of Health and Human Services (HHS), in 1981. In February 1985, HHS advertised an opening for a Deputy Medical Officer, a Senior Executive Service (SES) position within the Office of Disability of SSA's Baltimore, Maryland headquarters. Doe applied, was deemed most qualified from a list of twelve candidates, and was selected for the position by then-HHS Secretary Margaret Heckler in September 1985. Because, however, Doe was seeking appointment to the SES, HHS was required to obtain clearance

from the Office of Personnel Management (OPM) before Doe could assume his duties. In the course of its investigation, OPM submitted a name check request to the Federal Bureau of Investigation (FBI or Bureau) and obtained a Letter Head Memorandum (LHM) which contained information regarding Doe's background and activities. *See* Complaint Exhibit C. After considerable inter-agency maneuvering (which will be described in more detail below), Doe was informed in August 1986 that HHS had decided not to fill the Deputy Medical Officer position. Affidavit of William A. Isaacson (Isaacson Aff.), submitted with Plaintiff's Motion for Partial Summary Judgment, Exhibit 91.

Doe then filed a Privacy Act/Freedom of Information request with OPM requesting copies of records pertaining to himself. In response, he received the FBI's LHM and discovered what he believed to be numerous pieces of inaccurate information. These included:

1. A listing of plaintiff's arrest and conviction in 1973 on bombing charges when a Michigan state court had ordered in 1985 that the conviction be set aside and all records relating thereto be expunged;

2. The very description of the arrest as a "bombing" (since the arrest had been for possession of an explosive device and no bombing had occurred) and a statement that two bombs had been lawfully seized (Doe contended that only one bomb had been seized);

3. The FBI's description of an address book seized at his home as containing the names of "approximately 1000 alleged radicals";

4. The failure to mention that the "alternative service program" to which Doe had been sentenced consisted of providing free medical service to alcoholics;

5. The statement that Doe was employed by the Northeast Guidance Center at the time of his arrest—he claimed that he did not begin working there until one year later;

---

1. At his request, Doe's identity is not a matter of public record.

6. A report that Doe had appeared on a radio talk show known as the "Lou Gordon Show" in 1971 and stated that he was a Communist who "approved of the overthrow of the government by whatever means necessary";

7. The implication that Doe was a member of the Movement for a Democratic Society (MDS) and the Students for a Democratic Society (SDS) from inclusion of a memorandum describing those groups in connection with Doe's attendance of a rally in New York City in 1969 sponsored by them.

Complaint Exhibit D. On July 27, 1987 plaintiff wrote to the FBI and asked it to expunge the offending material. *Id.*

The FBI replied on August 25, 1987. The agency first noted that it had exempted its Central Records System (CRS) from the provisions of the Privacy Act but stated that it had decided to consider each request individually "to reach an equitable determination consistent with the best interests of both the individual and the Government." Complaint Exhibit E at 1. It then examined the inaccuracies alleged by plaintiff and denied the request for expungement. The FBI did state, however, that it would place a copy of the Michigan state court order in its files wherever mention was made of Doe's explosives arrest and conviction and that it would also include Doe's expungement request letter in its files "so that any one having future access to this information will have the benefit of your comments, observations and concerns." *Id.* at 3. Doe appealed the denial on November 17, 1987, *see* Complaint Exhibit F; his appeal was denied without substantive comment on February 16, 1988. *Id.* Exhibit G. Doe requested reconsideration on February 22, 1988, but the agency maintained its position. *Id.* Exhibits H & I.

Doe instituted this action against the FBI, OPM and HHS on August 18, 1988.[2] Counts One, Four and Five seek expungement of the inaccurate records in the possession of the FBI and OPM. Count Two seeks damages for maintenance of records that are not "accurate, complete, relevant and timely"; Count Three seeks damages because defendants maintain records that describe Doe's exercise of his First Amendment rights. After a period of discovery, the pending cross-motions followed.[3]

## II. The Statutory Provisions

In the words of Judge Ruth Bader Ginsburg, "[t]he Privacy Act speaks first and foremost to agencies." *Doe v. United States*, 821 F.2d 694, 697 (D.C.Cir.1987) (en banc) (hereinafter *Doe*). The statute prohibits them from "disclos[ing] any record ... to any person, or to another agency" unless the person consents to the disclosure or unless certain enumerated exceptions apply. 5 U.S.C. § 552a(b). When an individual seeks access to a record "pertaining to him," a federal agency must permit the person to "review the record and have a copy made." § 552a(d)(1). If the person requests amendment of the record, the agency must either "make any correction of any portion thereof which the individual believes is not accurate, relevant, timely, or complete" or inform the person of the reasons why it has refused to do so. § 552a(d)(2)(B). In the latter case, further review within the agency is required. § 552a(d)(3). Subsection (e) of the Act contains a number of important safeguards concerning the collection and dissemination of information by agencies, two of which are particularly relevant here. Agencies are compelled, in subsection (e)(5), to

> maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination.

§ 552a(e)(5). In addition, the statute also requires agencies in subsection (e)(7) to

> maintain no record describing how any individual exercises rights guaranteed by

---

**2.** Doe was granted leave to file an amended complaint on March 31, 1989; all references will be to that document unless otherwise noted.

**3.** Counsel are to be commended for the excellent briefs which have been submitted.

the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity.

§ 552a(e)(7).

The Act also provides a civil remedy for aggrieved individuals, who are authorized to bring an action in federal court under subsection (g)(1) whenever an agency

(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in accordance with that subsection;

(B) refuses to comply with an individual's request under subsection (d)(1) of this section;

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse affect on the individual.

§ 552a(g)(1). Specific remedies are tailored to the violation alleged. In a suit relying on subsection (g)(1)(A), the court "may order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct," § 552a(g)(2)(A), while in a case under subsection (g)(1)(B), the court "may enjoin the agency from withholding the records and order the production to the complainant of any agency records improperly withheld from him." § 552a(g)(3)(A). In both instances, the court is directed to "determine the matter de novo." In an action under subsections (g)(1)(C) or (D), the court may award "actual damages sustained by the individual as a result of the refusal or failure" (but not less than $1000) if it finds that "the agency acted in a manner that

was intentional or willful." § 552a(g)(4)(A). Reasonable attorney's fees and costs may also be recovered under all of these provisions.

### III. Expungement Claims

As noted above, three counts of the complaint request expungement of the material that Doe believes is inaccurate and incomplete. Count One, brought only against the FBI, is founded on the Privacy Act; Count Four, which names the FBI and OPM, rests on the Fifth Amendment of the Constitution; Count Five (also against the FBI and OPM) is founded on general equitable principles. Each will be discussed in turn.

#### A. Privacy Act

In Count One of the complaint, Doe asserts that inaccurate and incomplete records maintained by the FBI must be expunged in accordance with subsection (g)(1)(A). When an agency refuses to amend a record and suit is brought pursuant to subsection (g)(1)(A), the Privacy Act provides that a court may "order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct." § 552a(g)(2)(A). Defendants do not dispute the proposition, announced by our court of appeals in *Hobson v. Wilson*, 737 F.2d 1, 64 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), that "it is now well-established that an order for expungement of records is, in proper circumstances, a permissible remedy for an agency's violation of the Privacy Act." They do maintain, however, that the relevant records should not be expunged in this instance.

■ 1. Defendants initially contend that expungement is inappropriate because records in the CRS are not subject to the terms of the Privacy Act under two exemptions contained in the statute. The first is the general exemption contained in subsection (j)(2), which states:

The head of any agency may promulgate rules ... to exempt any system of records within the agency from any part

of this section ... if the system of records is

(2) maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws ... and which consists of ... information compiled for the purpose of a criminal investigation.

§ 552a(j)(2). In *Tijerina v. Walters*, 821 F.2d 789 (D.C.Cir.1987), however, the court of appeals pointed out that subsection (j) speaks to exempting a "system of records" and is

intended principally to permit the government to withhold *access* to certain sensitive information so as not to hamper law enforcement efforts. It specifically is not intended to permit agencies in any way to abridge their responsibilities governing *disclosure.*

821 F.2d at 796 (emphasis in original). Thus, while "an agency can employ subsection (j) in its expertise to adjust certain of its responsibilities under the Act, ... liability is not itself among an agency's responsibilities." *Id.* Defendants' reliance on subsection (j)(2) is therefore unwarranted in light of *Tijerina.*[4]

Defendants also invoke subsection (k)(2). It provides:

The head of any agency may promulgate rules ... to exempt any system of records within the agency from subsections (c)(3), (d), (e)(1), (e)(4)(G), (H), and (I) and (f) of this section if the system of records is

(2) investigatory material compiled for law enforcement purposes, other than material within the scope of subsection (j)(2) of this section.

§ 552a(k)(2). This provision, which also speaks to a "system of records" (rather than liability), is subject to the same constraints that animated the court in *Tijerina.* But an even stronger case can be made with respect to subsection (k)(2), since it expressly states which provisions may be exempted and the civil remedy provision of subsection (g) is not among them. Accordingly, defendants' exemption arguments will be rejected.[5]

2. Although they did not do so in their motion, defendants argue in their reply brief that exhaustion of administrative remedies is generally a prerequisite to suit under subsection (g)(1)(A), *Dickson v. OPM*, 828 F.2d 32, 40 (D.C.Cir.1987), and contend that exhaustion did not take place because Doe's Privacy Act amendment request only encompassed the LHM and not other FBI documents which formed the basis for the LHM or contained similar information. Defendants have conceded, however, that when Doe's request was received, "the FBI considered that the request sought amendment of the [LHM] and any other FBI document containing the disputed information." Second Declaration of James C. Felix, submitted with Defendants' Reply Brief, ¶ 17. Given this admission, the Court would not be "invad[ing] the obligation to make policy judgment committed in the first instance to the record keeping agency." *Dickson*, 828 F.2d at 40. The exhaustion doctrine does not bar Doe's claim, and the Court therefore proceeds to the merits of Doe's expungement request.

3. Before embarking on that endeavor, however, it is important to outline the standards that will guide the Court. The Privacy Act directs that in suits seeking review of denials of requests for amendment or

---

4. Defendants claim that this view "would effectively read the (j)(2) exemption out of the statute" and allows "subsection (j)(2) [to be] reduced to a nullity." Reply Brief at 7. *Tijerina* does not so hold. The court clearly stated that subsection (j)(2) could be used *internally* by an agency in dealing with requests for information but not *externally* in a civil action for violation of the Act's provisions. In other words, an agency could invoke the exemption to refuse a request for expungement but could not do so if

the requestor later brought suit and demonstrated that expungement was warranted.

5. Although defendants also seek to support their claim of exemption by invoking the FBI's regulations, those provisions "apply only to the extent that information in [the CRS] is subject to exemption pursuant to 5 U.S.C. 552(j) and (k)." 28 C.F.R. § 16.96(a). Since the Court has found the statutory exemptions inapplicable, the regulations likewise afford defendants no support.

expungement courts must "determine the matter de novo." § 552a(g)(2)(A). The scope of review envisioned by this phrase was explored by our court of appeals, sitting en banc, in *Doe:*

> [T]he term has no different, diminished meaning in the context at hand. De novo means here, as it ordinarily does, a fresh, independent determination of "the matter" at stake; the court's inquiry is not limited to or constricted by the administrative record, nor is any deference due the agency's conclusion.... Essentially, then, the district court's charge [is] to put itself in the agency's place, to make anew the same judgment earlier made by the agency.

821 F.2d at 697–98.

The substantive standards to be applied are also well-known. In the oft-quoted words of Judge John Sirica, the statute "create[s] a code of fair information practices that delineates the duties owed to individual citizens by the federal agencies that collect, store and disseminate information about them." *Smiertka v. United States Department of Treasury*, 447 F.Supp. 221, 224 (D.D.C.1978), *remanded on other grounds*, 604 F.2d 698 (D.C.Cir. 1979). The Act's basic command is that agencies must maintain records "with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness ... to the individual." § 552a(g)(1)(A). Because "the recordkeeper's polestar" should be " 'fairness' to the individual about whom information is gathered," *Doe*, 821 F.2d at 699, our Circuit has stressed that "it is feasible, necessary, and proper, for the agency and, in turn, the district court to determine whether each filed item of information is accurate." *Id.* The overriding need for fairness is violated if an agency either "collects and keeps without careful investigation derogatory information from unreliable sources or of a kind that could be run to earth with a reasonable degree of certainty" or if it "squirrels

away, deliberately or out of bureaucratic habit, unsubstantiated rumors, McCarthyesque innuendo, unchecked reports of dubious informers or prying neighbors." *Id.*[6]

At the same time, the Act also recognizes "the government's need to assemble critical information for responsible employment decisionmaking," *Dickson*, 828 F.2d at 40, and therefore "does not require an agency to maintain perfectly accurate records." *Vymetalik v. FBI*, 785 F.2d 1090, 1098 (D.C.Cir.1986). While expungement is certainly one remedy for information that violates the Act, fairness and accuracy will be achieved in some cases by "allowing a disputed question of fact or judgment previously recorded to remain in the record, qualified by subsequent data," *R.R. v. Department of Army*, 482 F.Supp. 770, 773 (D.D.C.1980), or by "adjust[ing] a file equitably to reflect actual uncertainty." *Doe*, 821 F.2d at 701. In short, courts are enjoined to make "a balanced judgment, one inherently involving a reasonableness criterion." *Id.* at 698 n. 10. With these standards in mind, the Court addresses the disputed documents.

### 1973 Arrest and Conviction

■ The LHM prepared by the FBI contains the following statement:

> On November 12, 1973, [Doe] and his wife ... were arrested at Ann Arbor Michigan, on bombing charges. These arrests were predicated on the lawful seizure by local police of two bombs and an address book containing the names of approximately 1,000 alleged radicals from the [Doe] residence.

> [Doe] entered a plea of guilty to the bombing charge, and, on August 14, 1975, he was sentenced to five years probation, fined $150, assessed court costs of $300, and ordered to serve 60 days in an alternative service program. At the time of his arrest, [Doe] was employed by the North East Guidance

---

**6.** Although *Doe* involved a claim for damages under subsections (g)(1)(C) and (g)(4) and Count One of the instant complaint seeks expungement under subsections (g)(1)(A) and (g)(2), *Doe* makes clear that the same standard applies. *See* 821 F.2d at 701 n. 19 ("If a record is maintained with the requisite accuracy, then it needs no amendment. Conversely, if the record needs to be amended, then it is not maintained with the requisite accuracy").

Center, 1700 East Warren, Detroit, Michigan.

Complaint Exhibit C at 1. On February 27, 1985, however, the Circuit Court of Washtenaw County, Michigan ordered that Doe's conviction be set aside and that "all records of this arrest and prosecution be expunged." Complaint Exhibit B. Doe points out that, under Michigan law, upon entry of the order he "shall be considered not to have been previously convicted," Mich.Comp.Laws § 780.622(1), and he argues that "[t]he statement in FBI records that John Doe was convicted for possession of an explosive device in the State of Michigan is a statement of legal fact that is now inaccurate and outdated." *See* Motion at 7. Plaintiff therefore seeks expungement of the LHM, as well as approximately 14 other documents, *see* Declaration of James C. Felix, submitted with Defendants' Motion (First Felix Dec.), Exhibit Y, retained by the Bureau in its CRS files which provide descriptions of Doe's arrest and conviction.

Although Doe's argument has some merit and the question is a close one, several factors persuade the Court that plaintiff's expungement request as to the 1973 arrest and conviction must be denied. First, Doe does not argue that the Michigan state court had authority to directly order the FBI to expunge its records.[7] Doe also does not dispute that he *was* actually arrested in 1973 and actually convicted in 1975 (by his plea of *nolo contendere*) in Michigan state court. And Doe does not maintain that the conviction was set aside because of some legal invalidity at the time of trial; he

admits that the expungement was ordered because he had no subsequent convictions and because his steady employment since the conviction demonstrated that he was rehabilitated.[8] Thus, while Doe's conviction no longer has any *legal* effect under state law, it is also true that, as a factual and historical matter, he *was* convicted of possessing an explosive device in 1975.

Moreover, the FBI has acknowledged that the descriptions of Doe's conviction are incomplete in light of the 1985 Michigan state order and has taken several affirmative steps to assure that their records are accurate. The agency has placed a copy of the set aside order in its files wherever the conviction is mentioned. Complaint Exhibit E at 3. It has placed Doe's complete Privacy Act amendment request in its files for future reference. *Id.* The Bureau has expunged the record of plaintiff's arrest and conviction from its Identification Division Records System (IDRS), a data bank that contains information, such as arrest and conviction records and fingerprints, used to provide criminal histories for federal, state and local entities. First Felix Dec. ¶¶ 5–7. And, admitting that its description of plaintiff as having been convicted on "bombing charges" "could be more precise," *id.* ¶ 49, it has appended a more complete (and accurate) description of the circumstances surrounding Doe's arrest and conviction to each document that refers to "bombing."[9] Considerable revision of the historical record has therefore already taken place.

7. Nor could he, since that court is established pursuant to state law and since its order was issued under state law (and makes no reference to federal records).

8. *See* Doe's Answer to Question 2 of HHS Interrogatory, submitted with Declaration of James Charles Scott (Scott Dec.), Exhibit 5 to Defendants' Statement of Material Facts as to Which There is no Genuine Issue.

9. The addendum states:
On November 12, 1973, [John Doe], age 32, and three other individuals were arrested by the Washtenaw County Sheriff's Department, Ann Arbor, Michigan, for possession of explosives. They were in possession of a pipe bomb and 50 pounds of ammonium nitrate prills soaked in petroleum. On December 11,

1973, he was charged with possession of an explosive device with intent to destroy property; and, on June 26, 1975, he entered a plea of *nolo contendere* to a lesser charge of possession of an explosive device without intent to destroy property. On August 14, 1975, he was sentenced to five years probation, fined $150, assessed court costs of $300, and ordered to serve 60 days in an alternative service program. On February 27, 1985, the Circuit Court of Washtenaw County, Michigan, ordered that the conviction be set aside pursuant to Michigan Code of Laws Annotated 780.-621 and that the records of his arrest and prosecution be expunged pursuant to state law.
First Felix Dec. Exhibit Z.

Finally, the documents that Doe seeks to have expunged come from the FBI's CRS files, which are generated by the Bureau for its own investigatory purposes. First Felix Dec. ¶ 8. In *Doe v. Webster*, 606 F.2d 1226 (D.C.Cir.1979), the court of appeals recognized that even when expungement of a conviction is required the government has "a legitimate need for maintaining criminal records in order to efficiently conduct future criminal investigations." 606 F.2d at 1243. While they are old, the arrest and conviction records could become relevant were Doe to engage in any future criminal activity. And it also bears mention that this CRS material is not freely available to the public, but rather may be disclosed outside of the agency only in certain discrete circumstances specified by regulation. *See* 52 Fed.Reg. 47,182, 47,241 (1987). For all of these reasons, the Court concludes that expungement of the FBI records describing Doe's arrest and conviction on explosives charges would be inappropriate under the Privacy Act.

### Remarks on Lou Gordon Show

■ The LHM contains the following passage:

> On the December 26, 1971, broadcast of the "Lou Gordon Show," a late-night talk show broadcast from Ann Arbor, Michigan, [Doe] described himself as a "communist" who "approved of the overthrow of the government by whatever means necessary."

Complaint Exhibit C at 1. This statement, as well as other documents containing similar remarks, stands on an entirely different footing than the report of Doe's arrest and conviction. Doe denies having made the remark and he steadfastly maintains that he is not and never was a Communist nor has he ever advocated the overthrow of the United States government. Affidavit of John Doe (Doe Aff.), submitted with Plaintiff's Motion, ¶ 5. Although the person who provided the FBI with this information was a local police officer, the agency's report states that the officer "caught

no other identifying data re subject," was "unaware as to whether subject made any other significant comments," and was "only 'half listening' to the program until above comments were made." Isaacson Aff. Exhibit 2. Moreover, although the Detroit Field Office of the FBI was asked to obtain a tape of the show in order to verify the statement, *id.*, the agency never did so. While the failure to perform this simple follow-through step is, from a bureaucratic standpoint, merely sloppy, it becomes fatal under the Privacy Act; for, as the court noted in *Doe*, "[t]he reasonable recordkeeper, guided by a standard stressing fairness, should be particularly vigilant in requiring independent, reliable verification of undocumented damaging bits of information gathered from third parties." 821 F.2d at 699 n. 14. Further, although the FBI conducted two wide-ranging investigations into Doe's activities in the early 1970s, defendants are still unable to muster a single piece of evidence to support this inflammatory, indeed ruinous, charge. Taken together, these considerations persuade the Court that "fundamental fairness" can only be served by expungement of the portion of the LHM containing the remarks that Doe is alleged to have made on the "Lou Gordon Show," as well as portions of any other CRS documents that contain this information.[10]

### Address Book

■ The LHM states that Doe's arrest on explosives changes in 1973 was predicated, in part, on the seizure of "an address book containing the names of approximately 1,000 alleged radicals from the [Doe] residence." Complaint Exhibit C at 1. Defendants now concede that this statement is inaccurate, and that the address book contains the names of 654 individuals (the rest being the names of organizations). First Felix Dec. ¶ 54. Defendants also admit that, of the 654 names, 130 (not 1,000) can now be characterized as "radicals or associates of radicals." *Id.* ¶ 56. They

---

10. Doe requests that the entire LHM be expunged because of the inaccurate information he challenges, but that remedy is too broad.

Defendants need only expunge relevant portions of documents containing material that violates subsection (g)(1)(A).

contend, however, that expungement should not be ordered because they have amended the passage in the LHM (and one other document containing the offending language) by placing, after the word "1,000," a footnote which reads "Individuals, organizations, etc., including many." Thus, the reader of the document who followed the footnote would learn of an address book "containing the names of approximately 1,000 individuals, organizations, etc., including many alleged radicals." *See* First Felix Dec. Exhibit Y.

The agency shall expunge this statement because, even as amended, it is still inaccurate and incomplete and leads to an unacceptable conclusion. First, although the FBI claims that only 130 of the names are "radicals" or "associates of radicals," the amended statement is still misleading. "Many" radicals could be 9, 90 or 900: the reader would not know how many of the 1,000 were "radicals." The statement is also incomplete, since the reader would also not know the nature of the other, "non-radical names." But more important is the inherent imprecision of the term chosen to describe the names in Doe's address book. The reader of the document, of course, would have no idea what this term signified. Before this Court, defendants state that these individuals are "radicals" "because they had criminal records, belonged to radical or extremist organizations, or they were the subject of an FBI National Security/Criminal investigation." First Felix Dec. ¶ 56. A perusal of the FBI's descriptions of these individuals, however, reveals that very few had criminal records or were subjects of a criminal investigation. Defendants are therefore left to argue that the names in Doe's address book are "radical" simply because (in a feat of non-definition) they belonged to "radical or extremist organizations." But in this instance radicalism is in the eye of the classifier (and, thus, in the eye of the beholder), for the entries in the address book include: a feminist organization seeking to "chang[e]

the lives of women and build[ ] a new society in which all people will have the opportunity to develop their full potential," Isaacson Aff. Ex. 41 at 5; a man known as a "pacifist" who has "given thought to entering the priesthood," *id.* Ex. 46 at 2–3; a person described as a "hippie," *id.* Ex. 24 at 2; a member of the National Lawyers Guild and a member of the Gay Liberation Front, *id.* Ex. 67 at 16, 25; an individual who in *1951* reserved a seat for himself at several Polish films by returning a card to the Polish consulate, *id.* Ex. 67 at 53; and a "well-known consumer advocate," *id.* Ex. 67 at 58.[11] The FBI's interest in these citizens in the turbulent atmosphere of the late 1960s and early 1970s undoubtedly reflected the concerns of that era. But the times have tempered and, with the resulting change in attitudes and perspectives, those blanket categorizations must now be viewed as unfortunate, ill-conceived and, indeed, bizarre. To brand these individuals as "radicals" when linking them to Doe in *1985* (when the LHM was prepared) transgresses the Privacy Act's requirement of accuracy in agency recordkeeping. Fairness demands that the passage describing Doe's address book be expunged.

### Association with MDS/SDS

In addition to its substantive comments, the LHM also attached "a classified memorandum relative to [Doe's] involvement in a demonstration which occurred in August, 1969." Complaint Exhibit C at 2. The memorandum, dated August 7, 1969, describes a protest against possible Blue Cross rate increases at the New York State Insurance Commission sponsored by the Movement for a Democratic Society (MDS) and the Students for a Democratic Society (SDS). Attached to the memorandum is a description of the SDS. Doe maintains that these records must be expunged because they imply that he was a member of the MDS and/or SDS when he in fact was not. The Court must disagree. Doe does not challenge the fact that he was present

---

**11.** Defendants also state, without specifying a number, that among the 130 names are "associates of radicals." First Felix Dec. ¶ 56. By its statement in the LHM, the FBI considers these

"associates" to be associates of Doe. The LHM passage therefore subjects plaintiff to a kind of quilted association—Doe is an associate of associates of radicals!

at the Blue Cross rally nor the description of the SDS attached to the report. Thus, the accuracy of the records is not in dispute. Moreover, none of the records state that Doe was a member of the MDS or SDS. Finally, the Court fails to divine the implication of membership drawn by Doe. Rather, the LHM states that plaintiff was involved in a rally, the accompanying report describes the rally, and the SDS memorandum describes the group which sponsored the rally, thereby providing the reader with the context of the event. Expungement is not required by the Privacy Act in these circumstances.

In sum, plaintiff shall be awarded partial relief with respect to Count One of the complaint. The FBI (the sole defendant named in this cause of action) shall expunge the passages in the LHM (and all other documents) that refer to Doe's remarks on the Lou Gordon show as well as the references to plaintiff's address book. Defendant need not, however, expunge Doe's arrest and conviction records nor the records pertaining to his involvement in the 1969 Blue Cross rally.

### B. Constitutional and Equitable Expungement

■ As noted above, Doe has already prevailed under the Privacy Act with respect to the "Lou Gordon Show" remarks and his address book. He also argues, in Counts Four and Five, that the records of his arrest and conviction in Michigan and his participation in the Blue Cross rally should be expunged from the files of the FBI and OPM under the Constitution and the inherent equitable powers of this Court. Although it is clear that these sources of authority allow expungement of agency records, see, e.g., Smith v. Nixon, 807 F.2d 197, 204 (1986); Chastain v. Kelley, 510 F.2d 1232, 1235 (D.C.Cir.1975),

they shall not be invoked here for two reasons. First, expungement is not available upon demand; it will only be ordered for a violation of some tangible constitutional right or a particular statutory provision. See, Nixon, 807 F.2d at 204 (illegal wiretap); Chastain, 510 F.2d at 1235 (expungement appropriate "where necessary to vindicate rights secured by the Constitution or by statute"); Tarlton v. Saxbe, 507 F.2d 1116, 1125 (D.C.Cir.1974) ("illegal arrests or convictions" provide a basis for expungement); Menard v. Saxbe, 498 F.2d 1017, 1025 (D.C.Cir.1974) (probable cause lacking and individual released after arrest). Here, however, Doe fails to articulate any such constitutional or statutory underpinning to support his expungement claim.[12] His request must therefore be denied.

Even had plaintiff relied on some constitutional or statutory provision, expungement would be warranted only if the possible harm to Doe from not expunging the records outweighed the government's need to retain his records. See Hobson, 737 F.2d at 65; Webster, 606 F.2d at 1241; Chastain, 510 F.2d at 1236. In considering Doe's Privacy Act claims, however, this Court attempted to determine "fundamental fairness" of maintaining each record by using the same type of balancing test and concluded that expungement was not warranted with respect to the Doe's arrest and conviction in Michigan or his involvement in the Blue Cross rally. For the same reasons, the Court concludes that expungement is neither compelled by the Constitution nor warranted under inherent equitable principles.[13]

### IV. Damage Claims

Plaintiff also seeks damages against all of the defendants in Counts Two and Three of the complaint.[14] The former is based on

---

**12.** Although plaintiff cites his "substantive right against arbitrary government action," Motion at 20 n. 13, he does not define the right nor explain its proper parameters.

**13.** The expungement of the "Lou Gordon Show" remarks and references to plaintiff's address book ordered under the Privacy Act was directed to the FBI, since Count One seeks relief only

as to that defendant. Count Five seeks relief as to OPM, however, and it is appropriate under inherent equitable principles that OPM also expunge the same information.

**14.** Citing United States v. Fausto, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), defendants argue that this Court lacks jurisdiction over

the defendants' failure to maintain accurate records under subsection (g)(1)(C) of the Privacy Act, which provides a civil action whenever an agency

> fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual.

§ 552a(g)(1)(C).[15] The latter is premised on subsection (e)(7), which states that an agency must

> maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or

unless pertinent to and within the scope of an authorized law enforcement activity.

§ 552a(e)(7). The substantive aspects of these provisions are clearly satisfied in the instant case. As far as subsection (g)(1)(C) is concerned, I concluded above that maintenance of the "Lou Gordon Show" remarks and the address book description violates the Privacy Act's "fundamental fairness" requirement. Moreover, although expungement was not required with regard to the arrest and conviction records, that decision was reached in large part because of the defendants' recent willingness to add clarifying material (such as the state court expungement order and the further description of the offense) to the LHM. Prior to plaintiff's Privacy Act amendment request, however, that document did not contain the supplementary materials and painted a picture that was

---

these Counts because "adjudication of plaintiff's claims ... would necessarily involve inquiry into specific agency processes involved in SSA's failure to appoint plaintiff to the Deputy Medical Officer position" and would "constitute judicial review in this Court of a specific personnel action (or non-action) by a federal agency." Defendants' Motion at 3. Defendants correctly note that plaintiff's damage claims involve an examination of whether the documents in question had any effect on his nonappointment and whether the defendants were "intentional or willful." But the mere fact that this case arises in the context of a non-appointment does not magically transform it into impermissible judicial review of an agency's personnel decision. Doe does not ask in these counts to be reappointed as Deputy Medical Officer; he asks for damages under the Privacy Act because he asserts that the non-appointment was caused by documents he believes to be inaccurate. Thus, even were plaintiff to receive all of the relief that he seeks, he still would not be entitled to the position that he was denied. In *Hubbard v. EPA*, 809 F.2d 1 (D.C.Cir.1986), *aff'd in part on other grounds sub nom. Spagnola v. Mathis*, 859 F.2d 223 (D.C.Cir.1988) (en banc), it was observed that "the Privacy Act permits a federal job applicant to recover damages for an adverse personnel action *actually caused* by an accurate or incomplete record" and district courts were urged to "carefully analyze the asserted causation link to be certain they are not exceeding their jurisdiction." 809 F.2d at 5 (emphasis in original). Defendants' argument, which would eviscerate subsections (g)(3) and (4), must be rejected in favor of the careful consideration required by *Hubbard*.

**15.** Count One is also based on subsection (e)(5), which requires federal agencies to

> maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination.

§ 552a(e)(5). A violation of subsection (e)(5) is actionable under the Privacy Act. *See Strang v. U.S. Arms Control & Disarmament Agency*, 864 F.2d 859, 864 (D.C.Cir.1989). Citing *Perry v. FBI*, 759 F.2d 1271 (7th Cir.1985), *rev'd on other grounds*, 781 F.2d 1294 (en banc), *cert. denied*, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986), defendants argue that FBI and OPM cannot be held liable because this provision only operates against an agency that both maintains inaccurate records *and* renders a determination as to that individual. Our court of appeals has not addressed this question thus far, however, *see Dickson*, 828 F.2d at 38, and two district courts have reached results contrary to *Perry*. *Doe v. United States Civil Service Commission*, 483 F.Supp. 539, 556 (S.D.N.Y.1980); *R.R. v. Department of the Army*, 482 F.Supp. 770, 773 (D.D.C. 1980). The Court need not enter that thicket, however, for the *Dickson* court held that subsection (g)(1)(C), which is nearly identical to subsection (e)(5), provides an independent basis for suit under the Privacy Act and does not require that the agency which maintains an inaccurate record also must make a determination adverse to the individual. 828 F.2d at 38.

clearly inaccurate and basically unfair—facts that defendants do not now dispute. *See* Motion at 21. Thus, the retention of the LHM and related documents by defendants at that time transgressed subsection (g)(1)(C). With respect to subsection (e)(7), defendants concede that the "Lou Gordon Show" portion of the LHM contains material that is regulated by that provision, since it provides direct quotations of remarks that Doe allegedly made on the air. Motion at 15. In addition, the records describing Doe's participation at the Blue Cross rally and the contents of his address book pertain to his associative activities, an area clearly entitled to First Amendment protection. *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 107 S.Ct. 1940, 1945–47, 95 L.Ed.2d 474 (1987). Defendants clearly maintained records describing the exercise of Doe's First Amendment rights.

That does not end the inquiry, however. To be entitled to damages, Doe must prove both causality—that any inaccurate records caused him to suffer an "adverse determination" or an "adverse effect," §§ 552a(g)(1)(C) & (D), and intent—that defendants acted in an "intentional and willful" manner, § 552a(g)(4). Having carefully considered the record presented and the parties' argument, the Court finds that defendants are entitled to summary judgment on these issues.[16] To explain these conclusions, a rather lengthy recitation of the events that precipitated the filing of this lawsuit is in order.

### Facts

The vacancy announcement for a Deputy Medical Officer (DMO) within SSA's Office of Disability was posted on February 13, 1985. Declaration of Nancy W. Tomford (Tomford Dec.), Exhibit 1 to Defendants' Statement of Material Facts as to Which There is no Genuine Issue (Defs. Statement), Exhibit A. On August 2, 1985 the Acting Commissioner of Social Security, Martha McSteen, sent a memorandum recommending that Doe be selected for the DMO job to the Assistant Secretary for Personnel Administration, Thomas S. McFee, whose office was responsible for processing SES appointments within HHS. Tomford Dec. ¶¶ 1, 5.[17] On September 4, 1985 McFee presented Doe's case to an Executive Personnel Group, a component which reviewed proposed SES appointments for the Secretary of HHS. Tomford Dec. Exhibit D. Based on the favorable recommendations of McFee and the Executive Personnel Group, Secretary Heckler approved Doe's appointment on September 9, 1985. *Id.* Exhibit E.[18]

Doe's nomination would not become final until it had been submitted to, and received the approval of, a Qualifications Review Board (QRB) established within OPM to consider SES appointments. *See* 5 U.S.C. § 3393(c). Noting that Doe "possesses the high caliber of professional skills and leadership abilities to perform successfully in this position," Secretary Heckler forwarded the nomination to OPM on September 11, 1985. Isaacson Aff. Exhibit 82. One week later, on September 17, 1985, a QRB was convened and disapproved Doe's case. Tomford Dec. ¶ 10. According to one member of the QRB, Doe's case was rejected because "he lacked sufficient experience to

---

**16.** Because of this disposition, the Court does not and need not address defendants' contention that Doe's subsection (e)(7) claim must be dismissed because the records involved were generated pursuant to an "authorized law enforcement activity," § 552a(e)(7).

**17.** Ms. McSteen observed that:
[Doe] is a skilled and effective manager whom I expect will perform the duties of the subject position in an outstanding manner. He possesses a broad knowledge of Social Security's programs. He also has broad experience supervising professional medical and administrative personnel.

*Id.* Exhibit B.

**18.** The memorandum of recommendation approved by Secretary Heckler stated:
[Doe's] candidacy resulted from an extensive search inside and outside the Federal Government. Of the twelve applications received for this position, five were found to be highly qualified and were referred to the initial recommending official for consideration. As a result of the evaluation process, [Doe] emerged as the best qualified candidate.
*Id.*

give him the breadth and depth of executive/managerial competence required for successful performance in the SES." Declaration of Bede A. Bender, Jr. (Bede Dec.), Exhibit 4 to Defs. Statement, ¶ 9. In accordance with OPM practice, HHS was permitted to and did resubmit a revised nomination package to OPM for further consideration on November 5, 1985. Isaacson Aff. Exhibit 79.[19]

Other events soon intervened, however. On December 13, 1985, President Reagan announced that he had selected Dr. Otis Bowen as the new Secretary of HHS (Secretary Heckler had announced her resignation the previous day). Tomford Dec. ¶ 12; Bede Dec. ¶ 15. Because OPM policy required that all action on pending QRB cases be suspended as a courtesy to a new agency head, OPM halted processing the four HHS cases (including Doe's) undergoing review and returned the nominations to the agency on December 18, 1985 without any QRB action. Tomford Dec. Exhibit F; Bede Dec. ¶¶ 14–16. At a meeting of HHS's Executive Personnel Group on January 6, 1986, no action was taken on Doe's nomination as DMO because Secretary Bowen had decided not to make SES appointments in divisions (such as SSA) that were being run by acting (rather than permanent) heads. Tomford Dec. ¶ 14; Declaration of Thomas S. McFee (McFee Dec.), Exhibit 6 to Defs. Statement, ¶ 7.

During this time, a security investigation into Doe's background was also underway. On August 8, 1985 (prior to Doe's selection by Secretary Heckler for the DMO job), HHS requested that OPM conduct a routine background investigation. Scott Dec. ¶ 7. OPM began its investigation on August 14, 1985. *Id.* ¶ 9. Both OPM and HHS sent a name check request to the FBI; HHS's was received by the Bureau on August 13, 1985, OPM's on August 27, 1985. Declaration of Storm M. Watkins (Watkins Dec.), Exhibit 10 to Defs. Statement, ¶¶ 2–3. In response, the FBI prepared the Letter Head Memorandum (LHM) referred to above. Although the document is dated August 29, 1985, it was not mailed to OPM until January 13, 1986 and there is no record of when it was mailed to HHS. *Id.* On the same day (January 13, 1986) that the LHM was mailed to OPM, OPM transmitted the preliminary results of its investigation to HHS without having received the LHM. Scott Dec. ¶¶ 9–11. Among the documents forwarded were OPM interviews with Doe, his family and references, a credit check and other records searches, but *not* the LHM. *Id.* When OPM finally received the LHM (the record is not clear as to exactly when this took place), OPM formally closed its investigation with a designation indicating "no actionable issues" and transmitted the LHM to HHS. Scott Dec. ¶ 12.

As of March 1986, matters stood this way. Doe's nomination had been sent to OPM, rejected by the QRB, resubmitted to OPM, returned to HHS because of the Secretarial change at the agency, and then held by HHS's Executive Personnel Group at its January 6, 1986 meeting. A background investigation of Doe had been conducted by OPM, the LHM had been generated by the FBI, the preliminary results had been sent to HHS in January 1986 without the LHM, and the investigation was closed in March and the LHM was sent by OPM to HHS. Additional events took place in April 1986. On April 18, 1986 HHS called OPM to ask whether OPM would waive its "nine month deadline"— which required that SES appointments be made within nine months from the date on which their vacancy notice had closed—in the case of John Doe (the DMO announcement had closed on March 8, 1985). OPM refused to waive the rule, informing HHS that it would have to readvertise the position. Bede Dec. ¶¶ 11–12. On April 22, 1986 HHS sent a memorandum to OPM asking it to reopen its investigation of Doe. Scott Dec. ¶ 13. Appended to the memo-

---

**19.** Included in the new package of materials was a recommendation from Acting Commissioner McSteen dated October 23, 1985 which provided "my very strongest personal endorsement" of Doe because he possessed "markedly superior qualifications for this position," was "brilliant in terms of professional and technical competence," and was "gifted with outstanding executive and leadership abilities." *Id.*

randum were a written interrogatory to Doe from HHS concerning the allegations contained in the LHM, Doe's written response, and a memorandum summarizing an oral interview with Doe concerning the same subject. *Id.* OPM reopened the investigation of Doe and forwarded the results to HHS on June 13, 1986. *Id.* ¶ 14. Based on these materials (which included the 1985 state expungement order), the head of HHS's Personnel and Information Security Group, a component of the Office of Personnel Administration responsible for security investigations of HHS employees, concluded that "no security or suitability issues exist which would preclude [Doe's] appointment to a critical sensitive position." Declaration of Donald E. Fay, Exhibit 2 to Defs. Statement, Exhibit B.

On June 23, 1986 Dorcas Hardy became the permanent Commissioner of SSA and, under Secretary Bowen's policy, Doe's appointment could be acted upon. HHS decided soon thereafter, on July 1, 1986, to remand Doe's case to SSA because the appointment was six months beyond OPM's "nine month deadline." Tomford Dec. ¶ 16; McFee Dec. ¶ 10. Although the DMO position could have been readvertised at that point and Doe could have reapplied, SSA decided against that course of action because of a need to reevaluate SSA in light of numerous personnel changes then occurring. These included: the recent arrival of Dorcas Hardy as SSA Commissioner; the fact that the Associate Commissioner for Disability, Patricia Owens, and the Medical Officer, Peter Chodoff, were due to leave SSA shortly; and a vacancy that existed in the position of Deputy Associate Commissioner for Disability. Declaration of Larry G. Massanari, Exhibit 7 to Defs. Statement, ¶ 7; Fay Dec. ¶ 7. Doe was informed of SSA's decision not to fill the DMO slot on August 19, 1986, Isaacson Aff. Exhibit 91, and ultimately the position was cancelled (along with nine others) more than two years later in September 1988. Fay Dec. ¶ 8; Bede Dec. ¶ 20.

### Causation

If inaccurate records are maintained by an agency, damages will be awarded under the Privacy Act only when "a determination is made which is adverse to the individual." § 552a(g)(1)(C). If First Amendment records are kept, the plaintiff must show that their retention had "an adverse effect" on him. § 552a(g)(1)(D). A Privacy Act plaintiff must therefore show that any adverse impacts he sustained were caused by a violation of the Privacy Act. *Dickson,* 828 F.2d at 37; *Molerio v. FBI,* 749 F.2d 815, 826 (D.C.Cir.1984); *Albright v. United States,* 732 F.2d 181, 186 (D.C.Cir.1984). In this instance Doe alleges that defendants' maintenance of inaccurate documents and First Amendment records caused him not to be appointed to the DMO position and that the dissemination of these records injured his reputation with his fellow workers. Each of these contentions is considered in turn.

■ 1. DMO Position. It is clear from the outline of events described above that Doe's failure to be appointed as DMO did not result from any Privacy Act violation. To briefly summarize:

—The QRB initially disapproved Doe's appointment because of concerns about his competence *before* OPM had received the LHM.

—After the nomination was resubmitted, the QRB returned it to HHS because of the change of Secretaries at HHS. Once again, this action occurred *prior* to the receipt of the LHM by OPM.

—Because Secretary Bowen would not make SES appointments in a division without a permanent head, and because SSA did not have a permanent Commissioner until June 1986, no action was taken on Doe's nomination between January and June 1986.

—SSA made repeated efforts to obtain Doe's appointment, including: vigorously seeking approval from the QRB after its initial rejection, calling OPM to secure a waiver of the "nine month deadline," allowing Doe an opportunity to rebut the allegations contained in the LHM, and providing Doe's version of events to OPM when HHS asked it to reopen the background investigation of Doe.

—After the reopened OPM investigation was terminated, the head of HHS's investigations unit found no security impediments to Doe's appointment.

—HHS remanded Doe's case to SSA because of the "nine month deadline" and SSA decided not to fill the DMO job because of an excessive personnel turnover that was then occurring in management positions.

Notwithstanding this impressive recitation, Doe argues that genuine issues of fact exist with regard to HHS's decision not to appoint him as DMO. A number of contentions are raised to support plaintiff's theory that the information contained in the LHM must have played some part in the decision not to appoint him. None is persuasive. For example, Doe repeatedly points out that he was the most qualified candidate for the DMO job. But this is nowhere disputed. To the contrary, defendants fully appreciated his excellent qualifications, *see supra* notes 17–19, and his appointment was personally and vigorously pursued at the highest levels. Doe next observes that the HHS officials responsible for the appointment decision knew that security concerns had been raised and "stopped promoting" him after they learned of this information. While the individuals involved have acknowledged that they knew security concerns were raised, many have stated that they did not know the nature of those concerns and each has emphasized that security issues played no part in HHS's decision to remand Doe's case to SSA and SSA's decision not to fill the job.[20] And Doe has simply produced no "concrete" or "affirmative" support for his claim that HHS officials "stopped promoting him" after the security concerns became apparent. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 257, 106 S.Ct. 2505, 2514, 2514 91 L.Ed.2d 202 (1986).[21] Next, Doe cites an April 22, 1986 memorandum from HHS to OPM stating that resolution of the security issues that were the

subject of the reopened investigation "will have a direct bearing on the subject's appointment with this agency." Isaacson Aff. Exhibit 88. That argument proves too much: the same official later concluded (after the investigation was closed) that no security concerns precluded Doe's appointment. Doe also asserts that summary judgment would not be proper because the question of HHS's intent "depends entirely" on the credibility of the defendants' affiants, Motion at 42, and because depositions of these officials have yet to be taken. Plaintiff is doubly in error. The affiants' testimony does not stand alone, as the documentary evidence summarized above amply attests. And the absence of depositions does not preclude the entry of summary judgment—Doe has suggested no reason to doubt the veracity of these individuals, has not stated why he could not have taken their depositions, and has received thousands of pages of materials since discovery commenced on October 20, 1988 (when he filed his first set of interrogatories and request for production of documents). Doe's assertion that summary judgment should not be entered with respect to whether his non-appointment as DMO was caused by the existence or dissemination of the LHM must, therefore, be rejected.

■ 2. Reputation. Doe also insists that dissemination of inaccurate and First Amendment documents caused injury to his reputation. Before examining Doe's argument, it is important to emphasize that this claim must be limited to plaintiff's subsection (e)(7) cause of action, as to which liability may exist if an "adverse effect" is found. § 552a(e)(7). Under subsection (g)(1)(C), by contrast, an adverse "determination" must be made regarding "the qualifications, character, rights or opportunities of, or benefits to, the individual." 5 U.S.C. § 552a(g)(1)(C). Reputational injury simply does not qualify under that standard, and

---

**20.** *See* Tomford Dec. ¶¶ 17–18; Fay Dec. ¶¶ 9–11; McFee Dec. ¶¶ 8–11; Massanari Dec. ¶¶ 8–11; Declaration of Evelyn M. Kirby, Exhibit 3 to Defs. Statement, ¶¶ 8–10.

**21.** Plaintiff fails to address why, if the HHS officials were determined not to reappoint him, they did not simply appoint another person to the position rather than leave it vacant for two years before it was cancelled.

thus the Court's inquiry focuses on whether the statements concerning plaintiff's appearance on the "Lou Gordon Show," his address book and his participation at the Blue Cross rally caused him reputational harm.

Plaintiff does not contend, as he did with respect to the DMO position, that genuine issues of fact exist regarding his reputational injury. Rather, his argument proceeds as follows:

[I]n early 1986, Pat Owens [the Associate Commissioner of Disability and a friend of Doe's who had selected him for the DMO job], her deputies, and other SSA officials stopped pushing for my appointment. All the momentum for my appointment ground to a halt. Shortly thereafter, I learned from security officials at SSA that the FBI had disclosed to SSA officials documents they had in their possession about me. Those documents apparently included the statements that I had been convicted on bombing charges, made statement on the Lou Gordon Show to which I have previously referred, had an address book with over one thousand alleged radicals in it, and had attended a demonstration on August 4, 1969 to which I have also previously referred.

Around this time, I learned that Pat Owens knew about these FBI records. I also learned that she had told various other officials, including her deputies, about these records. I learned, for example, that one of Pat Owens' deputies was saying in the office that I had a security problem because I have been involved with radicals and had been convicted in a bombing incident. As these rumors spread through the Disability Branch of the SSA national office, several of my colleagues and associates there stopped pushing for my appointment and stopped having anything to do with me. Pat Owens, in particular, stopped talking to me or having meals with me as she had in the past. In general, my reputa-

tion around the SSA national office was severely damaged by these disclosures. Doe Aff. ¶¶ 19–20. These two paragraphs from Doe's own affidavit simply do not prove the causal link between the First Amendment records and the injury to his reputation. First, this passage is unclear as to the dates involved ("early 1986," "[a]round this time") and is vague regarding the extent of the disclosure he alleges ("several of my colleagues and associates"). Moreover, Doe's statement stands entirely on its own, with no support from any other HHS or SSA official.[22] In addition, Ms. Owens has submitted her own affidavit in which she denies withdrawing socially from Doe or declining to push for his appointment. *See* Declaration of Patricia Owens, Exhibit 2 to Defendants' Reply Brief, ¶¶ 5(m)-(*o*). And Doe's contention that his reputation was caused solely by official dissemination of subsection (e)(7) material is challenged. Ms. Owens observes that she did not learn of the security concerns about Doe through official channels but rather from a third person who was provided that information from Doe. *Id.* ¶ 5(k). Doe admits that he told one other individual about the LHM, but contends that this individual was the only person he discussed the matter with and recently told him that she had kept his confidences to herself. Second Affidavit of John Doe, submitted with Plaintiff's Reply Brief, ¶ 5. Without an affidavit from that person (with whom Doe is "good friends"), plaintiff's argument lacks support. Finally, even disregarding all of these matters, the fact remains that, when HHS learned of the LHM charges, it gave Doe the opportunity to clear his name, sought to reopen the investigation with OPM, and then concluded that it found *no* security impediments to his appointments. If anything, the agency sought to restore, not to besmirch, his reputation. The Court therefore concludes that Doe has not sustained his burden of proving that the dissemination of First Amendment records pertaining to him caused injury to his reputation.

---

**22.** The one person who did submit an affidavit only mentions that he learned Doe had been convicted on bombing charges, *see* April 20,

1989 Notice of Filing ¶ 3, but, as noted above, only subsection (e)(7) material is relevant to Doe's reputational injury claim.

### Intent

Another prerequisite to a successful damages claim under the Privacy Act is proof that "the agency acted in a manner that was intentional or willful." § 552a(g)(4). Our court of appeals has observed that this standard "does not require the [agency] official to set out purposely to violate the Act," *Tijerina*, 821 F.2d at 799, but must rather be viewed "as only somewhat greater than gross negligence." *Id.* (quoting *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act*, reprinted in 120 Cong.Rec. 40,405–06 (1974)). At the same time, the government is not "strictly liable for every affirmative or negligent action that might be said technically to violate the Privacy Act's provisions." *Albright*, 732 F.2d at 189. The requisite intent will exist only when the agency "commit[s] the act without grounds for believing it to be lawful, or ... flagrantly disregard[s] others' rights under the Act." *Id.* As the court noted in *Laningham v. United States Navy*, 813 F.2d 1236 (D.C.Cir.1987) (per curiam), "the violation must be so 'patently egregious and unlawful' that anyone undertaking the conduct should have known it 'unlawful.' " *Id.* at 1242 (quoting *Wisdom v. HUD*, 713 F.2d 422, 422 (8th Cir.1983), *cert. denied*, 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 678 (1984)). "[D]isjointed or confused" action, or "administrative oversight," will not suffice. *Perry v. Block*, 684 F.2d 121, 129 (D.C.Cir.1982) (per curiam). Having examined the circumstances surrounding Doe's aborted appointment in light of these standards, it must be concluded that none of the defendants acted with the level of intent necessary to violate the Privacy Act.

■ 1. HHS. The record is clear that, when HHS became aware in March 1986 of the allegations contained in the LHM, it immediately undertook affirmative steps to investigate the matter. Doe was given an opportunity, both orally and in writing, to respond to the agency's concerns. After he did so, HHS forwarded this information to OPM and requested that the investigation into his background be reopened. When the reopened investigation was completed, SSA was satisfied that no security impediments prevented his appointment as DMO.

Doe concedes the steps taken by HHS. Motion at 28. He argues, however, that the "intentional or willful" standard was breached because HHS thereafter failed to expunge the records containing inaccurate information about his Michigan arrest and conviction, his "Lou Gordon" remarks, his address book and his connection with the MDS and SDS. *Id.* at 28–29, 35. This claim is difficult to comprehend, since Doe never submitted a formal request for amendment or expungement to HHS. Leaving that fact aside, even had the agency thereafter maintained records that were to some degree inaccurate, HHS's efforts to exonerate Doe, its conclusion that no security problems existed with regard to his appointment, and its inclusion of Doe's version of events demonstrate that it did not do so "without grounds for believing it to be lawful" or in "flagrant disregard" of Doe's rights. Plaintiff has offered no evidence upon which the Court could conclude otherwise.

■ 2. OPM. There is also no basis on which to find that OPM acted in an "intentional or willful" manner to violate the Privacy Act. Doe signed a form authorizing the collection of information about him from criminal justice agencies. Scott Dec. ¶ 8. Thereafter, and at the request of HHS, OPM undertook a background investigation of plaintiff, an investigation which it is specifically authorized by law to perform, *see* 5 U.S.C. § 3301(2). It then forwarded the preliminary results of its investigation to HHS in January 1986 with a notation that it had discovered "no actionable issues" and, when the LHM was received, it sent that document to HHS and closed its investigation. When HHS later requested that the investigation be reopened, OPM conducted a follow-up investigation into the allegations contained in the LHM.

Doe contends that OPM violated the Privacy Act in an "intentional and willful" manner by transmitting the LHM to HHS without first verifying the accuracy of its

contents. Motion at 35. But OPM obtained the LHM from the FBI, the federal agency charged with investigation of federal criminal laws. While OPM may have been amiss in relying on that source without further inquiry, its actions were certainly not so "patently egregious and unlawful" that the individuals involved should have known that they were violating the Privacy Act.[23] I therefore conclude that OPM did not act in an "intentional and willful" manner so as to subject it to damages under subsection (g)(4) of the Privacy Act.

 3. FBI. Plaintiff's principal argument in support of his contention that the FBI violated the "intentional and willful" standard is that only three documents out of the entire FBI files pertaining to Doe were reviewed before the LHM was prepared. Although such a course of action is not to be condoned, it cannot be said that "somewhat greater than gross negligence" was at work. First, the three documents upon which the LHM was based (two FBI prosecutive reports and a memorandum to the Deputy Attorney General from the head of the Justice Department's Freedom of Information and Privacy Unit, *see* Watkins Dec. ¶ 5) were not unofficial or unreliable sources of information. Moreover, the haphazard manner in which the LHM was prepared must be understood in the context of the enormous number of name check requests handled by the Bureau each year: in 1985, for example, approximately 2.3 *million* were received and processed by the agency. Watkins Dec. ¶ 3. Lastly, although the FBI admits that the LHM was inaccurate in certain respects, there is absolutely no evidence that

this was anything other than a normal response to a name check request by the FBI or that there was any attempt to "get" plaintiff. No one can doubt that preparation of the LHM was sloppy, but its sloppiness was not "intentional and willful" within the meaning of the Privacy Act.[24]

## V. Conclusion

After having been selected as the most qualified individual for the DMO position and after having undergone a lengthy wait while the appointment was being processed, John Doe was informed that the agency had determined not to fill the position. Subsequently, he also discovered that a security investigation had brought to light records concerning distant events including one—the arrest and conviction in Michigan—for which he had been pronounced rehabilitated by a state court in 1985. Given this scenario, Doe's belief that these records caused his nonappointment and injured his reputation, as well as his desire to have all of the materials expunged, are understandable. Nonetheless, the language of the Privacy Act, the cases construing the statute, and the totality of the record convinces the Court that some (but not all) of the materials need be expunged and that the records did not cause his non-appointment or injury to his reputation.

To recapitulate. Plaintiff's damage claims in Counts Two and Three must be rejected because of his failure to prove causation and intent. His expungement claim under the Privacy Act in Count One shall be granted in part (as to the address book and the "Lou Gordon Show") and denied in part (as to the arrest and convic-

---

**23.** Once again, plaintiff offers nothing, save for his own conclusion, to support a contrary result.

**24.** Doe's other two arguments merit little discussion. He first contends that the FBI maintains a "policy" of removing expunged conviction records from its rap sheet files but not from its CRS files, thereby showing its deliberate disregard of the Privacy Act's command of maintaining accurate records. Motion at 36. But, as the court of appeals observed in *Webster* and as this Court reiterated above, *see supra,* the FBI has an important interest in retaining the con-

viction records for possible use in future investigations. As a final measure of intent Doe asserts that the FBI follows a policy of nonacquiescence in decisions of the District of Columbia Circuit because it denied his Privacy Act amendment request based on the exemption in subsection (j)(2) despite the decision in *Vymetalik v. FBI.* The FBI also relied on subsection (k), however, and, even though it believed the material requested was exempt from the Act, it still decided to consider each request on its merits. Complaint Exhibit E.

tion in Michigan and the Blue Cross rally). Doe's request for expungement in Counts Four and Five will be denied.

Accordingly, it is

ORDERED that plaintiff's motion for partial summary judgment shall be granted in part, and defendants shall expunge any portion of any records or documents in their files relating to plaintiff John Doe's address book and his statements on the "Lou Gordon Show." Defendants' motion for summary judgment shall be denied as to these documents; it is

FURTHER ORDERED that, in all other respects, plaintiff's motion for partial summary judgment shall be denied and defendants' motion for summary judgment shall be granted; it is

FURTHER ORDERED that a motion for attorney's fees and costs, if any, shall be filed on or before October 2, 1989.[25] Defendants' opposition shall be due October 23, 1989; reply by October 29, 1989. Should either party appeal this decision, then consideration of any attorney's fees/costs motion will be stayed pending the appellate decision; and it is

FURTHER ORDERED that this action be and it hereby is dismissed.

---

**25.** Attorney's fees may be assessed under the Privacy Act, *see* §§ 552a(g)(2)(B), (g)(3)(B) & (g)(4)(B), and plaintiff requested them in his amended complaint (at 13).