John DOE, Appellee,

v.

FEDERAL BUREAU OF
INVESTIGATION, et al.,
Appellants.

John DOE, Appellant,

v.

FEDERAL BUREAU OF
INVESTIGATION, et al.,
Appellees.

Nos. 90–5037, 90–5038.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 2, 1991.
Decided June 28, 1991.

Wendy M. Keats, Atty., U.S. Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Leonard Schaitman, Atty., U.S. Dept. of Justice, were on the brief, Washington, D.C., for appellants in No. 90–5037 and appellees in No. 90–5038. R. Craig Lawrence and Edith S. Marshall, Asst. U.S. Attys., Washington, D.C., also entered appearances for appellants in 90–5037 and appellees in 90–5038.

William A. Isaacson, with whom Mitchell Rogovin and Denitta D. Ascue, were on the brief, Washington, D.C., for appellee in No. 90–5037 and appellant in No. 90–5038.

Before EDWARDS, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Separate opinion concurring in part and dissenting in part filed by Circuit Judge SENTELLE.

HARRY T. EDWARDS, Circuit Judge:

This case involves a request under the Privacy Act for amendment of records compiled by the Federal Bureau of Investigation ("FBI"). After being denied appointment to a high-level federal position, appellant John Doe obtained access to a background report that had been prepared by the FBI and then used by Government officials in assessing Doe's qualifications for the job in question. Believing much of the information in the report to be inaccurate, Doe requested the FBI to expunge certain material. After the FBI denied his request, Doe brought a Privacy Act claim in District Court seeking monetary damages and expungement of both the report and the records in the FBI's investigatory files from which the objectionable information had been derived. The District Court ordered the FBI to expunge some of the challenged records, found expungement unwarranted with regard to others and rejected Doe's request for damages. Both par-

ties now appeal those portions of the District Court's rulings adverse to them.[1]

We affirm the District Court's judgment in part, reverse it in part, and remand one aspect of the case to the District Court for further proceedings. The underlying investigatory records from which the FBI's background report was derived were compiled for "law enforcement purposes," and thus fall within the scope of a FBI regulation exempting such records from the statute's amendment requirements. Accordingly, we affirm the District Court's judgment denying expungement of some of these records, and reverse its judgment ordering expungement of the rest.

As to the background report itself, we hold that this document, though not compiled for law enforcement purposes, will also qualify for exemption from the Act's amendment provisions as a law enforcement record if such treatment is justified by the interests underlying the FBI's exemption regulation. However, we are unable to make this determination on the present record; therefore, we remand the case to the District Court for further proceedings directed to this question.

I. BACKGROUND

A. Facts

In 1985, Doe, a physician, applied for a position with the Social Security Administration ("SSA") as a Deputy Medical Officer. Doe was selected from among 12 applicants and his nomination was submitted to the Qualifications Review Board ("QRB") of the Office of Personnel Management ("OPM") for final approval. In the course of investigating Doe's background, the QRB submitted a name check request to the FBI. The FBI responded with a two-page Letter Head Memorandum ("LHM") summarizing information derived from its Central Records System ("CRS")[2] regarding Doe's background and political activities during the late 1960s and early 1970s.

---

**1.** Doe does not appeal the District Court's denial of his damages claim.

**2.** The CRS is the FBI's central filing system, containing the agency's investigative records on various individuals and subject matters.

Before any final determination had been made concerning Doe's qualifications, SSA decided not to fill the vacant Deputy Medical Officer position until incoming management had had an opportunity to reassess the agency's needs.[3] Upon learning that his appointment had been delayed, Doe submitted a Privacy Act/Freedom of Information Act request to OPM seeking copies of all records pertaining to him; thereafter, in response to his request, Doe received a copy of the LHM. In July 1987, Doe sent the FBI a letter asking agency officials to expunge certain information in the LHM that he believed to be inaccurate. Among the information to which Doe objected were:

1. A description of his arrest and conviction in 1973 on "bombing" charges: Doe pointed out that his arrest and conviction had been for possession of an explosive device and that no actual bombing had occurred; more generally, he objected that any reference to this incident was inappropriate because a Michigan state court had set aside the conviction in 1985 on the basis of Doe's rehabilitation and had ordered that all references thereto be expunged.

2. A description of an address book seized from Doe's home as "containing the names of approximately 1,000 alleged radicals": Doe maintained that this description mischaracterized the contents of the address book, which consisted of the names of relatives, neighbors, professional associates and individuals with whom he had had professional contacts.

3. A report that Doe had appeared on a 1971 radio talk show and stated that he was a Communist who "approved of the overthrow of the government by whatever means necessary": Doe denied that the alleged incident ever took place.

4. A memorandum describing two activist political groups, the Movement for a Democratic Society ("MDS") and the Students for a Democratic Society ("SDS"), attached to a reference to Doe's attendance at a 1969 rally sponsored by these groups: Doe claimed that the inclusion of the memorandum inaccurately implied that he was a member of these organizations.

Complaint Exh. D. The FBI rejected Doe's request in a letter dated August 25, 1987. The FBI first noted that it had exempted its CRS by regulation from the Privacy Act's amendment provisions, but stated that its policy was to consider each amendment request on a case-by-case basis and to attempt "to reach an equitable determination consistent with the best interests of both the individual and the Government." Complaint Exh. E at 1. Upon review of Doe's letter, the FBI found expungement unwarranted, concluding that Doe had not demonstrated that the LHM contained any factual errors. The FBI agreed, however, to place Doe's expungement request in its files and to include a copy of the Michigan state court order expunging Doe's explosives conviction within any file that referred to that conviction.

After unsuccessfully appealing the FBI's decision within the agency, Doe brought this action in District Court seeking monetary damages under the Privacy Act and expungement of the allegedly inaccurate records under the Act, the Fifth Amendment of the Constitution and common law equity principles.[4] Following discovery, both sides moved for summary judgment.

In its decision on these motions, the District Court rejected the FBI's threshold argument that its regulation exempting the CRS from the Privacy Act's amendment requirements foreclosed Doe's expungement claim, holding that an agency exemption has no effect on the agency's civil liability for violating the Act. *Doe v. FBI*, 718 F.Supp. 90, 95 (D.D.C.1989). On the merits of the amendment claim, the trial court found that both the FBI's description of the address book as containing the names of "approximately 1,000 alleged radicals" and its reference to Doe's alleged statements on the radio show were inaccu-

---

3. The new management ultimately decided, for reasons unrelated to this case, to cancel the position entirely.

4. Only Doe's statutory expungement claim is at issue in this appeal.

rate and misleading, and ordered the FBI to expunge this information from its files. *Id.* at 98–99. The court ruled, however, that the FBI's reference to Doe's 1973 conviction need not be deleted, because it remained historically accurate despite the State of Michigan's expungement of the conviction and was potentially relevant to future FBI investigations. *Id.* at 97–98. The court also did not order expungement of the references to Doe's attendance at the 1969 rally, finding that the records did not imply that Doe was a member of the sponsoring organizations. *Id.* at 100. Finally, the court denied Doe's claim for damages, finding no evidence that Doe had suffered an adverse determination or effect attributable to the inaccuracy of the records or that the FBI had violated the Act intentionally or willfully, both prerequisites to monetary damages under the Act. *See id.* at 102. The present appeal and cross-appeal followed.

## B. *The Regulatory Framework*

Like the pieces of a faulty jigsaw puzzle, the provisions of the Privacy Act frequently leave gaps at the points where they purport to connect; this can make interpretation of the Act a daunting task. Therefore, in order to avoid confusion with respect to the proper application of the statute in this case, we will attempt to set out those pieces of the puzzle relevant to the present dispute.

A principal function of the Act is to require agencies to keep accurate "systems of records."[5] The Act provides that an agency must maintain all records used by it in making determinations about individuals "with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5) (1988). In furtherance of this goal, the Act

grants individuals the right to obtain access to agency records pertaining to them, and to request amendment of any records they believe to be inaccurate, irrelevant, untimely, or incomplete. 5 U.S.C. § 552a(d)(1) & (2) (1988). Where an agency denies such an amendment request, the Act grants the individual seeking amendment the right to obtain agency review. 5 U.S.C. § 552a(d)(3) (1988).

Subsection (g), the Act's civil remedies provision, provides an enforcement mechanism for individuals whose rights to accurate record-keeping under the Act allegedly have been violated. Subsection (g) authorizes a private right of action in federal court whenever any agency:

(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection; [or]

. . . . .

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual.

5 U.S.C. § 552a(g)(1)(A) & (C) (1988). For suits brought under subsection (g)(1)(A), the Act authorizes the district court to undertake *de novo* review of the agency's amendment decision and to order the agency to amend the challenged records where appropriate. *See* 5 U.S.C. § 552a(g)(2)(A) (1988).[6] For actions under subsection (g)(1)(C), the Act provides a monetary damages remedy if the agency's action was intentional or willful and the claimant can

---

5. The Act defines a "system of records" as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5) (1988).

6. Where the inaccuracy or unfairness taints the record as a whole, the district court may order the agency to expunge the record from its files. *See Hobson v. Wilson,* 737 F.2d 1, 64 (D.C.Cir. 1984) ("expungement . . . is, in proper circumstances, a permissible remedy for an agency's violation of the Privacy Act"), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).

demonstrate actual damages resulting from the violation. 5 U.S.C. § 552a(g)(4) (1988).

■ The obligations created by the Act are not absolute, however. The Act permits agencies to exempt certain systems of records from some of its requirements. Relevant to this case are subsection (j)(2)(B), which authorizes a law enforcement agency to exempt any system of records consisting of "information compiled for the purpose of a criminal investigation ... and associated with an identifiable individual," and subsection (k)(2), which permits any agency to exempt a system of records containing "investigatory material compiled for law enforcement purposes, other than material within the scope of subsection (j)(2)." 5 U.S.C. § 552a(j)(2)(B) & (k)(2) (1988). To implement a subsection (j) or (k) exemption, an agency must promulgate, in accordance with the notice and comment provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (1988), an exemption rule that contains a statement of the reasons for the exemption.

## II. ANALYSIS

### A. Doe's Subsection (g)(1)(A) Claim Seeking "Amendment"

Subsection (d), the provision of the Act requiring agencies, *inter alia*, to entertain and evaluate amendment requests, is one of the provisions from which certain systems of records may be exempted pursuant to subsections (j) and (k). Citing investigative and administrative interests, the FBI has promulgated a rule in accordance with the procedural requirements of subsections (j) and (k) that exempts its CRS to the fullest permissible extent from the requirements of subsection (d). *See* 28 C.F.R. § 16.96(a)(1) (1990). The FBI argues that this rule relieves the agency of any obligation to update and correct records in its investigative files, and that the District Court's judgment ordering it to expunge some of these records must therefore be reversed. With regard to all but one of the challenged records, we agree.

1. The Effect of the FBI's Exemption Rule Upon Its Liability Under Subsection (g)(1)(A)

■ We first consider whether the FBI may be held liable for violating the amendment provisions of the Act where it has exempted its records from those provisions. The District Court answered this question in the affirmative, finding that, while "an agency could invoke the exemption to refuse a request for expungement," it "could not do so if the requestor later brought suit and demonstrated that expungement was warranted." 718 F.Supp. at 95 n. 4. Because we conclude that the District Court's narrow construction of the scope of subsection (j) and (k) exemptions cannot be reconciled with the structure and language of the Act, we reverse its holding.

The Privacy Act expressly premises judicial review of amendment claims on agency action either under, or in violation of, subsection (d)(3), the provision of the Act requiring agencies to grant administrative review of their denials of amendment requests. Thus, subsection (g)(1)(A) authorizes civil actions only when an agency "makes a determination *under subsection (d)(3)* ... not to amend an individual's record in accordance with his request, or fails to make such review *in conformity with that subsection.*" 5 U.S.C. § 552a(g)(1)(A) (1988) (emphasis added). It necessarily follows from this language that an agency's refusal to amend a record that it properly has exempted from subsection (d) cannot give rise to a subsection (g)(1)(A) claim—the administrative review provisions forming the predicate to such a claim simply do not pertain to the disputed record as a result of the agency's exemption.

The District Court nonetheless found *de novo* consideration of Doe's amendment claim to be appropriate under our decision in *Tijerina v. Walters*, 821 F.2d 789 (D.C. Cir.1987). In *Tijerina*, the appellant sued the Veterans Administration ("VA") for violating provisions of the Act that restrict agencies' authority to disclose personal information. The VA argued that it could not be held liable for its actions because it had exempted the system of records con-

taining the disclosed information from the civil remedies provisions of subsection (g).

The court refused to give effect to the VA's purported exemption from liability. The court observed that the Act "specifically forbids the agency from exempting records from the Act's many constraints and obligations governing disclosure of personal information," including those alleged to have been breached in the case before it. *Id.* at 796.[7] Consequently, the court noted, a determination that the VA could exempt itself from civil liability for violating these obligations would "defang completely the strict limitations on disclosure that Congress intended to impose," requiring the court to embrace the anomalous notion "that at the same time ... [Congress] forbade agencies to exempt systems of records from disclosure requirements, ... [it] intended them to be able to elude civil liability at their caprice." *Id.* at 797. Finding such a result to be inconsistent with both the language of the Act and the purposes underlying its exemption provisions, the court flatly rejected the "agency's efforts to elude civil liability for violations of statutory duties which cannot be shirked under the Act." *Id.* at 795.

The District Court erred in finding judicial review in this case to be justified by *Tijerina.* As the quoted language illustrates, *Tijerina* merely held that an agency cannot escape liability for violating *non-exemptible* Privacy Act obligations simply by exempting itself from the Act's remedial provisions. Our decision in *Tijerina* recognized that such purported exemptions would frustrate Congress' intent that some of the Act's requirements constrain all agency record-keeping activity equally.

Considerations of legislative intent dictate a completely different outcome in this case, where the obligation at issue is one from which Congress expressly *authorized* agencies to exempt some systems of records. Thus, a determination that a civil claim for expungement may be foreclosed

by an agency's exemption rule is not only consistent with, but necessary to effectuate, Congress' intent that certain records systems may truly be sheltered from the Act's amendment procedures; an agency exemption from subsection (d) would serve little purpose, after all, if the agency were still fully answerable in court for not complying with the demands of that subsection. In sum, as both *Tijerina* and our decision today recognize, the touchstone for an agency's liability to suit under the Act is the substantive obligation underlying the plaintiff's claim.

Accordingly, we reverse the District Court and hold that a cause of action under subsection (g)(1)(A) for an agency's denial of an amendment request cannot lie with regard to records that the agency has properly exempted from the Act's amendment requirements.

## 2. "Law Enforcement Purpose"

Having concluded that an agency is not liable under subsection (g)(1)(A) for rejecting amendment requests concerning records exempted from subsection (d), we next consider whether the FBI's exemption applies to the particular records at issue in this case.

The Privacy Act authorizes agencies to exempt from its access and amendment provisions all systems of records consisting of "investigatory material compiled for law enforcement purposes." Subsection (j)(2) empowers law enforcement agencies to exempt from subsection (d) certain types of criminal records systems, including those consisting of "information compiled for the purpose of a criminal investigation ... and associated with an identifiable individual," 5 U.S.C. § 552a(j)(2)(B) (1988), while subsection (k)(2) permits any agency to exempt from subsection (d) any other records system containing "investigatory material compiled for law enforcement purposes," 5

---

7. The provisions at issue in *Tijerina* included subsection (b), which limits an agency's authority to disclose personal information without the consent of the individual to whom the information pertains, and subsection (e)(6), which ob-

ligates an agency to make reasonable efforts to ensure the accuracy of information it discloses to any person other than an agency.

U.S.C. § 552a(k)(2) (1988).[8]

■ Although both subsections (j) and (k) refer to "systems of records," we have previously held that 28 C.F.R. § 16.96 (1990), the FBI exemption regulation respecting its CRS, does not remove that entire filing system from the requirements of the Act; rather, CRS documents qualify for exemption only if they constitute law enforcement records within the meaning of the statute. *Vymetalik v. FBI,* 785 F.2d 1090, 1095 (D.C.Cir.1986). Accordingly, the FBI bears the burden of demonstrating a law enforcement purpose for each record as to which it has claimed exemption in this case.

The District Court never purported to decide whether the records challenged by Doe qualify as law enforcement records; having erroneously ruled that the FBI's exemption regulation could not preclude it from considering the merits of Doe's amendment claim *de novo,* the court had no occasion to consider the possible application of that regulation to the records in this case. With regard to all but one of the challenged records, however, the record is complete and there are no material facts in dispute; we are therefore free to determine the applicability of the FBI's regulation to these documents. *See Ryan v. Department of Justice,* 617 F.2d 781, 789–91 (D.C. Cir.1980) (appeal of summary judgment decision where, although district court had not decided issue, appellate court made legal conclusion on basis of undisputed facts that certain documents came within FOIA exemption).

■ In making this determination, we shall borrow the test for "law enforcement purpose" that we devised in *Pratt v. Webster,* 673 F.2d 408, 420–21 (D.C.Cir.1982), to evaluate the applicability of Exemption 7 of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7) (1988), to law enforcement agency records. The *Pratt* test adapts well to the Privacy Act context because the language of subsection (k)(2), the

more inclusive of the Act's two exemption provisions, is virtually identical to that of FOIA Exemption 7: subsection (k)(2) applies to systems of records containing "investigatory *material* compiled for law enforcement purposes," while Exemption 7 encompasses "investigatory *records* compiled for law enforcement purposes." *See Vymetalik,* 785 F.2d at 1098 (instructing District Court on remand to apply *Pratt* definition of law enforcement records in determining whether disputed FBI records qualified for Privacy Act exemption).

Under the *Pratt* test, records kept by a law enforcement agency must meet two criteria in order to qualify as law enforcement records. First, "the agency's investigatory activities that give rise to the documents sought must be related to the enforcement of federal laws or to the maintenance of national security." *Pratt,* 673 F.2d at 420 (emphasis removed). An agency does not satisfy this requirement when "merely engaging in a general monitoring of private individuals' activities"; rather, the agency must demonstrate a connection between its investigation and the existence of a "possible security risk or violation of federal law." *Id.; cf. Shaw v. FBI,* 749 F.2d 58, 64–65 (D.C.Cir.1984) (Scalia, J.) (exemption extends to investigation, conducted for "federally authorized purpose," of *non-federal* crime).

Second, "the nexus between the investigation and one of the agency's law enforcement duties must be based on information sufficient to support at least 'a colorable claim' of its rationality." *Id.* at 421 (emphasis removed). This second requirement is "deferential to the particular problems of a criminal law enforcement agency"; while it is not met where the agency offers a "pretextual or wholly unbelievable" basis for a claim that its investigation was rationally related to its law enforcement duty, a reviewing court "should be hesitant to second-guess a law enforcement agen-

---

**8.** As we find, *infra,* that, with the exception of the LHM, each of the records in this case fits within the broad definition of "investigatory material compiled for law enforcement pur-

poses," we need not determine whether subsection (j)(2)(B) or subsection (k)(2) is the more appropriate exemption provision for each such record.

cy's decision to investigate if there is a plausible basis for its decision." *Id.*

When an agency meets both prongs of the *Pratt* test, the burden shifts to the plaintiff to produce evidence that the asserted law enforcement rationale for an investigation was in fact pretextual. *See Shaw*, 749 F.2d at 63–64. If the plaintiff fails to rebut the showing of law enforcement purpose, the agency is entitled to summary judgment. *See King v. United States Department of Justice*, 830 F.2d 210, 231–32 (D.C.Cir.1987). We shall divide the FBI records at issue in this case into three categories for purposes of our analysis: the investigatory records compiled after Doe's arrest in 1973 on the explosives charge; those compiled prior to that arrest; and the LHM prepared pursuant to OPM's name check request.

### a. The Post–Arrest Records

■ The records compiled after Doe's arrest, which include the records of his arrest and conviction and a document in the FBI's files describing his address book as "containing the names of approximately 1,000 alleged radicals," clearly constitute law enforcement records for purposes of the Act. These documents were placed in the CRS pursuant to a FBI investigation of Doe's unauthorized possession of an explosive device. As Doe concedes, his "commission of ... [this] crime was a legitimate impetus for an investigation of [his] ... possible involvement with [the federal crimes of] insurrection, seditious conspiracy and the possession of explosives." [9] Brief for Appellee/Cross–Appellant at 26–27. Thus, the post-arrest records meet the first prong of the *Pratt* test, because the "investigatory activities that gave rise to the documents" were "related to the enforcement of federal laws." *Pratt*, 673 F.2d at 420.

In addition, we find that the FBI possessed a "colorable claim" of rationality for its investigation, thereby satisfying

*Pratt*'s second prong. Certain materials seized from Doe's residence following his arrest resembled those used in recent unsolved bombing incidents in Michigan and neighboring states. Although FBI investigators ultimately concluded that no association could be made between the materials found at Doe's residence and those involved in these bombings, Doe's unlawful possession of explosives clearly justified the agency's investigation of possible further criminal involvement on his part, including the inquiry into his contacts and acquaintances that led to the agency record describing Doe's address book. As Doe has failed to point to any evidence that would suggest that the FBI was motivated by anything other than legitimate investigatory concerns, we conclude that the FBI's actions leading to the post-arrest records were reasonably related to a "law enforcement purpose." Consequently, the FBI's exemption applies and Doe cannot maintain a subsection (g)(1)(A) action seeking the expungement of these records.

### b. The Pre–Arrest Records

■ The records pertaining to Doe that were compiled prior to his explosives arrest, including references to his attendance at the SDS/MDS-sponsored meeting and the hearsay statement that Doe had admitted to being a Communist who advocated overthrow of the Government by whatever means necessary, were collected pursuant to the FBI's Administrative Index ("ADEX"), described by the agency as a "program for identifying individuals who might pose a danger to national security." [10] One of the functions of this highly controversial and now-defunct program was to safeguard the national security from attempts forcibly to overthrow the Government. While the FBI's use of the ADEX program in the late 1960s to target those individuals whose political orientation the agency deemed "radical" was misguid-

---

**9.** These crimes are codified at 18 U.S.C. § 2383 (1988) (rebellion or insurrection); 18 U.S.C. § 2384 (1988) (seditious conspiracy); and 18 U.S.C. § 844(d) (1988) (explosives and incendiary devices).

**10.** Reply and Responsive Brief for Appellants/Cross–Appellees at 25.

ed, there can be no denying that the national security interests underlying the ADEX program were within the scope of the FBI's law enforcement mission. *See Pratt,* 673 F.2d at 422 ("whatever we may think of the FBI's methods, we cannot conclude therefrom that ... [its] activities ... lacked any law enforcement purpose"). Accordingly, the FBI's investigation of Doe satisfies the first prong of the *Pratt* test, since the "investigatory activities" leading to the creation of the relevant records were directly linked to "the maintenance of national security."[11]

We also conclude that the FBI's investigatory activities had a "colorable claim" of rationality. The FBI's attention was drawn to Doe when it received reports of his disturbing a speech by a presidential candidate and of his advocating violent overthrow of the Government on radio. The FBI then instituted a limited investigation of Doe, aimed solely at determining whether his activities warranted more serious investigation as a potential threat to national security. This investigation revealed, among other things, that Doe had been arrested at a rally sponsored by the MDS/SDS organizations. The FBI concluded, however, that Doe posed no genuine security risk and terminated its investigation.

As we recognized in *Pratt,* a law enforcement agency "often must act upon unverified tips and suspicions based upon mere tidbits of information." 673 F.2d at 421. Although the evidence prompting the FBI's investigation of Doe was sketchy at best, Doe has not cited any tangible evidence to indicate that, at the time the FBI included the pre-arrest records in the CRS, its investigation was motivated by anything other than a genuine concern about the national security. Given *Pratt*'s deferential standard, we cannot deem the rela-

tionship between the investigatory activities leading up to these records and legitimate security concerns to be so tenuous as to render pretextual the FBI's assertion of law enforcement purpose. Accordingly, we find that these records are also exempted from subsection (d) pursuant to the FBI's exemption regulation, and that Doe may not seek their expungement under subsection (g)(1)(A).

### c. The LHM

█ The final record is the LHM that the FBI prepared for OPM. This document was not created pursuant to a law enforcement investigation; rather, it was prepared to assist the Government in assessing Doe's employment application. Doe accordingly argues that the LHM was not "compiled for law enforcement purposes" and is thus subject to the amendment provisions of the Act. Doe claims that such a result is compelled by our holding in *Vymetalik* that records generated solely as part of routine FBI security checks of federal employment applicants would not qualify for exemption under subsection (k)(2).

Despite Doe's assertions, *Vymetalik* does not resolve the question before us. In that case, the record indicated that the information in the disputed documents had been *gathered exclusively* for the employment review and not for reasons of law enforcement. The court thus found that the only exemption that appeared applicable to the challenged records was that created by subsection (k)(5), which refers to systems of records consisting of "investigatory material *compiled solely* for the purpose of determining suitability, eligibility, or qualifications for Federal ... employment." 5 U.S.C. § 552a(k)(5) (1988) (em-

---

11. In this regard, we reject Doe's assertions that the FBI's investigatory activities constituted merely a "general monitoring of [a] private individual['s] ... activities." *See Pratt,* 673 F.2d at 420. The FBI may properly investigate incidents suggesting a likelihood of political violence to ensure that no genuine threat to national security is posed thereby. Both pre-arrest records were created only after the FBI had received reports of Doe's alleged militant statements on a radio show as well as of his throwing an object at a presidential candidate in public. We find these alleged activities sufficiently removed from harmless private conduct to render the FBI's subsequent investigatory activities relevant to a "possible security risk" under the *Pratt* formulation.

phasis added).[12] In remanding the case for additional factual findings, however, the court recognized that, "[s]hould the FBI come forward with evidence suggesting a law enforcement purpose other than mere background investigation, the District Court remains free to conclude that the records constitute law enforcement records." 785 F.2d at 1098.

While the LHM was created solely for employment review, the investigatory material it contained was originally gathered for law enforcement, not employment, purposes. The critical question, then, is whether the FBI's investigatory information on Doe lost its exempt status when it was subsequently used, in altered form, for a non-law enforcement purpose.

The Supreme Court confronted a similar issue in the context of a FOIA Exemption 7 claim in *FBI v. Abramson*, 456 U.S. 615, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982). In *Abramson*, the Court held that information contained in records originally compiled for law enforcement purposes does not lose its exempt status under Exemption 7 when later summarized in records compiled for non-law enforcement purposes. To hold otherwise, the Court stated, would be to treat the "originally compiled record and the derivative summary ... completely differently although the content of the information is the same and although the reasons for maintaining its confidentiality remain equally strong." *Id.* at 625, 102 S.Ct. at 2061. The Court deemed it unnecessary to reach this anomalous result, finding the statutory language of FOIA Exemption 7 "reasonably construable to protect that part of an otherwise non-exempt compilation which essentially reproduces and is substantially the equivalent of all or part of an earlier record made for law enforcement uses." *Id.* This interpretation, the Court stated, "more accurately reflects the

intention of Congress, is more consistent with the structure of the Act, and more fully serves the purposes of the statute." *Id.*

*Abramson*, however, did not involve a Privacy Act exemption claim; therefore, it does not directly control our disposition of this case. Nonetheless, as we have already noted, law enforcement records under the Privacy Act are defined in essentially identical terms as under FOIA: both statutes permit exemption of "investigatory" material "compiled for law enforcement purposes."[13] Given this congruence of the relevant statutory language, we believe that the Court's holding in *Abramson* cannot be ignored in the Privacy Act context. We recognize that a FOIA exemption protects against the disclosure of information, while a Privacy Act exemption of the sort here in issue protects against the amendment or expungement of information that has been disclosed. Thus, the precise concerns motivating the Court's decision in *Abramson* are not present in a Privacy Act case like this one. Nonetheless, in both contexts, there is a threshhold inquiry as to whether disputed material is properly characterized as "compiled for law enforcement purposes." The Court in *Abramson* said that *recompilation* does not change the nature of the material, and we do not see how we can avoid this definitional principle in this case. Accordingly, we hold that information contained in a document qualifying for subsection (j) or (k) exemption as a law enforcement record does not lose its exempt status when recompiled in a non-law enforcement record if the purposes underlying the exemption of the original document pertain to the recompilation as well.

█ Our next task, then, is to determine whether shielding the LHM from the Privacy Act's amendment provisions would serve the interests underlying the agency's ex-

---

12. Subsection (k)(5) permits material to be exempted from the Act's requirements only to the extent that *disclosure* would compromise confidential Government sources. Consequently, it would not pertain here where the FBI refused to amend information that had already been disclosed to the individual seeking amendment.

13. As we have also noted, while the Privacy Act's exemption provisions refer to investigative "systems of records" and FOIA Exemption 7 to individual investigative "records," Privacy Act exemptions, like FOIA exemptions, attach to particular records only to the extent that those records were compiled for "law enforcement purposes." *See Vymetalik*, 785 F.2d at 1095.

emption of its law enforcement records from those provisions. In *Abramson*, this inquiry was subsumed within the determination of whether the documents came within the ambit of Exemption 7, because Congress expressly restricted the coverage of FOIA's law enforcement record exemption to those records whose disclosure would have specific adverse effects. *See* 5 U.S.C. § 552(b)(7) (1988) (listing the six types of disclosure-related harms justifying exemption of law enforcement records). As a result, the treatment of recompiled records under FOIA is fairly straightforward: "[o]nce it is established that information was compiled pursuant to a legitimate law enforcement investigation and that disclosure of such information would lead to one of the listed harms, the information is exempt." *Abramson*, 456 U.S. at 631, 102 S.Ct. at 2064.

In contrast, the proper analysis of recompiled records under the Privacy Act requires an additional layer of analysis. In creating subsections (j) and (k) of the Privacy Act, Congress did *not* delineate the agency interests justifying exemption as it had in FOIA. Instead, with one exception,[14] Congress granted agencies broad discretion to exempt all law enforcement records systems from the Act's access and amendment provisions, provided that the agencies promulgate their exemption rules in accordance with the rulemaking provisions of the APA, and provide in those rules statements of the reasons for the exemptions. Thus, in determining whether treatment of the LHM as a law enforcement record would promote the purposes underlying the law enforcement exemption, we must look to the reasons that the FBI

itself has given for promulgating that exemption.

The FBI's exemption regulation provides two justifications for immunizing the CRS from the access and amendment provisions of subsection (d). The first, mirroring Exemption 7 of FOIA, recites the adverse effects that disclosure of investigative records would have upon law enforcement. *See* 28 C.F.R. § 16.96(b)(2)(i) & (ii) (1990). The FBI concedes that these access-related concerns do not apply where, as here, the agency refuses to expunge information that has already been disclosed to the person seeking expungement.

The FBI's second reason for exemption applies specifically to the Act's amendment provision, subsection (d)(2), and states that exemption from that subsection is appropriate

> because to require the FBI to amend information thought to be incorrect, irrelevant or untimely, because of the nature of the information collected and the essential length of time it is maintained, would create an impossible administrative and investigative burden by forcing the agency to continuously retrograde its investigations attempting to resolve questions of accuracy, etc.

28 C.F.R. § 16.96(b)(2)(iii) (1990).

It is quite probable that, given the unsubstantiated nature of the information providing the grist for most law enforcement investigations and the lengthy periods of time that such investigations may cover, subjecting the entire CRS to the amendment requirements of the Act would "create an impossible administrative and investigative burden" for the FBI.[15] How-

---

**14.** That exception is subsection (k)(2)'s provision that an individual must be granted access to law enforcement material (other than that covered by subsection (j)(2)) which results in her being denied any right, privilege or benefit, unless disclosure would reveal the identity of confidential Government sources.

**15.** We note that the legislative history of the Privacy Act suggests that, in authorizing agencies to exempt law enforcement records from the Act's access and amendment provisions, Congress focused primarily, if not exclusively, upon the problems resulting from *disclosure* of

such material. Thus, the Senate Committee on Government Operations' report on the original Senate bill noted that law enforcement agencies maintain files with "highly sensitive and usually confidential information collected ... in anticipation of criminal activity," and concluded that it would therefore "not be appropriate to allow individuals to *see* their own intelligence or investigative files." S.Rep. No. 1183, 93d Cong., 2d Sess. 23 (1974) U.S.Code Cong. & Admin.News 1974, pp. 6916, 6938. (Emphasis added), *reprinted in* Committee on Government Operations, United States Senate, and the Committee on Government Operations, House of Representatives,

ever, our present inquiry involves the proper treatment of only one discrete subset of the FBI's files—non-law enforcement records that contain information originally compiled for law enforcement purposes.

Subjecting these particular records to the Act's amendment requirements is not as clearly necessary to effectuate the purposes behind the agency's exemption from these requirements. The District Court noted, *see* 718 F.Supp. at 108, and the FBI reiterated at oral argument, that the FBI received approximately 2.3 million name check requests in 1985. It appears, however, that only a small fraction of these requests were submitted for non-law enforcement purposes. The Annual Report of the Attorney General for 1985 indicates that the FBI performed only 4,171 employment background checks, and 615 "expanded" name checks, for other agencies;[16] the other 2.295 million name checks presumably were conducted for genuine law en-

forcement purposes, and hence would qualify for subsection (j) or (k) exemption on their own terms.

Accordingly, we cannot conclude on the present record that employment-related FBI name checks should be accorded exempt status under the Privacy Act in order to further the interests underlying the FBI's exemption from subsection (d)(2). Instead, we remand this portion of the case to the District Court for further development of the record and a determination as to whether the likely burden to the FBI from processing amendment requests *involving non-law enforcement records containing law enforcement information* is sufficient to justify exempting such documents from the Act's amendment provisions. In other words, the trial court must assess whether exempting these records is justified by the asserted interests underlying the FBI's exemption regulations.[17]

---

Legislative History of the Privacy Act of 1974 S.3418 (Public Law 93–579), Source Book on Privacy 176 (1976) [hereinafter Source Book]. In its report on the House bill, the House Government Operations Committee justified subsection (k)'s specific exemption for law enforcement records on the grounds that "[i]ndividual *access* to certain law enforcement files could impair investigations," and explained subsection (j)'s general exemption for criminal justice records systems by noting that such systems "contain particularly sensitive information" and "are so different in use from other kinds of records that their *disclosure* should be governed by separate legislation." H.R.Rep. No. 1416, 93d Cong., 2d Sess. 18–19 (1974) (emphasis added), *reprinted in* Source Book, *supra*, at 311–312.

There does not appear to be any indication that Congress considered whether an agency should be permitted to refuse to amend records whose law enforcement-related contents had already been disclosed, based solely on the burden that the *processing* of such requests would create.

**16.** Office of the Attorney General, U.S. Department of Justice, Annual Report of the Attorney General of the United States, 1985, at 51 (1986).

**17.** Given the discretion agencies possess under the Privacy Act to exempt certain types of records systems from some of the Act's obligations, our holding the FBI to the specific reasons stated in its exemption regulation might at first blush seem hypertechnical. We deem such treatment fully appropriate, however; although Congress delegated discretion to agencies to exempt law enforcement systems of

records, it required them to subject proposed exemption rules to public comment, so that the agencies would "be able to modify their decisions taking ... [the public's] views into account." H.R.Rep. No. 1416, 93d Cong., 2d Sess. 19 (1974), *reprinted in* Source Book, *supra* note 15, at 312; *see also* S.Rep. No. 1183, 93d Cong., 2d Sess. 75 (1974), U.S.Code Cong. & Admin. News 1974, p. 6989, *reprinted in* Source Book, *supra* note 15, at 228. ("The Committee intends that this public rulemaking process would involve candid discussion of the general type of information that the agency maintains which it feels falls within these definitions and the reasons why access, challenge or disclosure would 'seriously damage' the purpose of the maintenance of the information.").

In exempting the CRS from the amendment obligations of the Act, the agency apparently weighed the effects of those obligations upon its law enforcement filing system as a whole, without separately assessing the comparative burden that compliance with the Act would create solely with regard to those non-law enforcement records in FBI files that contain law enforcement information. We cannot conclude that, had the question of whether to exempt this discrete subset of its records been the focus of the FBI's rulemaking and the public comment generated thereby, the FBI would have found exemption appropriate, especially given the heightened public interest in accurate recordkeeping where FBI records are disseminated to other Government agencies and used as part of non-law enforcement determinations.

Moreover, our decision is consistent with the legislative history of the Act, which reflects Con-

Relevant to this inquiry would be recent statistics on the number of non-law enforcement records containing law enforcement information that the FBI creates for other agencies, as well as the number of amendment requests that the agency receives with regard to such records.

■ Finally, we reject Doe's broader contention that exemption from subsection (d)(2) would be appropriate only if the FBI could demonstrate that complying with the Act's amendment procedures with regard to the particular records at issue in this case would impose an "impossible administrative and investigative burden." The FBI's exemption regulation clearly refers to the *cumulative* burden that the FBI would face were it required to undergo a thorough review of the merits of every amendment request that it received, and to amend each of those records that it determined to be inaccurate or outdated. No single amendment request is ever likely to pose an "impossible administrative and investigatory burden"; rather, it is the processing of a myriad of such requests that might prove onerous and that arguably provides the justification for the agency's exemption regulation.[18] Accordingly, the District Court should consider upon remand whether the cumulative burden that the FBI would face from having to evaluate and respond to amendment requests involving records in its files compiled for non-law enforcement purposes justifies the exemption of such records *as a class* from the Act's amendment provisions.[19]

## B. *The Availability of Relief under Subsection (e)(5)*

■ Doe argues in the alternative that, even if the FBI's exemption rule deprives him of a cause of action under subsection

gress' intent that agencies only employ Privacy Act exemptions where truly necessary. Thus, the Senate Committee emphasized that an agency could not exempt "a whole filing system simply because ... investigative information is commingled with information and files which should legitimately be subject to the access, challenge and disclosure provisions." S.Rep. No. 1183, 93d Cong., 2d Sess. 75 (1974), U.S.Code Cong. & Admin.News 1974, p. 6989, *reprinted in* Source Book, *supra* note 15, at 228. And, in discussing law enforcement exemptions from the Act's disclosure requirements, the House Committee urged agencies "to make available ... whatever files can be made available without clearly infringing on the ability of the agencies to fulfill their missions" and "to open ... documents to the individuals named in them insofar as such action would not impair the proper functioning of the agencies." H.Rep. No 1416, 93d Cong., 2d Sess. 19–20 (1974), *reprinted in* Source Book, *supra* note 15, at 312–313.

18. Contrary to our dissenting colleague's suggestion, our recognition that the FBI may properly justify exempting *law enforcement* records from the amendment requirements of the Act based upon the cumulative burdens of compliance is in no way inconsistent with our refusal automatically to apply the FBI's exemption regulation to the *non-law enforcement* records in the CRS. Law enforcement records, as a class, are subject to exemption under the statute; therefore, the FBI may exempt each law enforcement record based on the cumulative burdens that would arise were all such records subjected to the Act's amendment requirements. Whether the "class" of non-law enforcement records originally compiled for law enforcement purposes should be deemed "law enforcement records" under the Act, however, is the very issue presented in this case. *Vymetalik* makes clear that such documents are not "law enforcement records" merely because they are contained in the CRS; rather, such documents must qualify for exemption on their own terms. Thus, in determining whether non-law enforcement records containing law enforcement information should properly be considered "law enforcement records," and hence subject to exemption, we necessarily must inquire into whether exemption of this particular class of records is justified by the purposes underlying the agency's regulation.

19. Doe also contends that the FBI's exemption regulation cannot apply to any of the challenged records in this case because the FBI's rationale for its exemption applies to subsection (d)(2) (governing initial agency rulings on amendment requests), rather than to subsection (d)(3) (regarding administrative review and final agency determinations concerning such requests), the provision upon which Doe's civil claim is based.

This argument is specious. There was no need for the FBI to provide a separate justification for exempting its files from subsection (d)(3), because review under subsection (d)(3) is predicated upon an initial decision having been made under subsection (d)(2). To the extent the FBI properly exempted itself for the reasons stated in the rule from its duty to entertain and evaluate amendment requests concerning CRS records in the first instance, the FBI can have no derivative obligation to undertake subsection (d)(3) review of its denial of such requests.

(g)(1)(A), he is entitled to expungement directly under subsection (e)(5). That subsection provides that an agency must

> maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination.

5 U.S.C. § 552a(e)(5) (1988). Noting that the FBI has not exempted its CRS from subsection (e)(5), Doe argues that he was entitled to a declaratory judgment under that subsection requiring expungement of the relevant records.

Doe essentially asks us to fashion an end-run around the Privacy Act's specific remedial provisions. The Act provides two avenues of redress for violations of subsection (e)(5). Where an agency has rejected an individual's request that it amend its records so as to bring them into compliance with the strictures of this subsection, the individual normally may bring suit under subsection (g)(1)(A). As noted above, however, with the possible exception of the LHM, the FBI's exemption from the Act's amendment requirements foreclosed subsection (g)(1)(A) review in this case. The other means of redress contemplated by the Act is provided by subsection (g)(1)(C), which authorizes an individual to bring an action whenever an agency

> fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently *a determination is made which is adverse to the individual.*

5 U.S.C. § 552a(g)(1)(C) (1988) (emphasis added). If the plaintiff prevails in an action under subsection (g)(1)(C) *and* demonstrates that the agency's action was "intentional or willful," the remedy authorized by the Act is monetary damages. 5 U.S.C. § 552a(g)(4) (1988). This remedy, however, is unavailable in this case because of the

District Court's findings, unchallenged on appeal, that Doe was not adversely affected as a result of the FBI's record-keeping and that the agency's actions were neither willful nor intentional.

Where Congress has provided specific channels for redressing statutory violations, we must assume that Congress intended those channels to be the exclusive remedies available to claimants. We therefore decline Doe's invitation to bypass the prerequisites to liability created by the Act and to recognize an entirely separate remedy arising directly under subsection (e)(5).

C. *The Availability of Relief under Subsection (e)(7)*

 Lastly, Doe argues that, under subsection (e)(7), he was entitled to a declaratory judgment requiring expungement of the records relating to the talk show and the SDS/MDS meeting and the references thereto in the LHM. Subsection (e)(7) provides that an agency shall

> maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity.

5 U.S.C. § 552a(e)(7) (1988). We reject this claim for substantially the same reasons that we decline to recognize a cause of action directly under subsection (e)(5). Although none of the Act's specific remedial provisions address violations of subsection (e)(7), the statute's catch-all liability provision provides that an individual may bring a civil action whenever an agency "fails to comply with any ... provision of [the Act] ... in such a way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D) (1988). The District Court below found that Doe had not suffered any adverse effect as a result of the FBI's alleged violation of subsection (e)(7), and he has not challenged this finding upon appeal; accordingly, Doe is foreclosed from obtaining relief based upon this provision.

Moreover, to the extent that Doe's argument is directed to the underlying investigative records in the FBI's files, it is clear that subsection (e)(7) was not violated in this case. Subsection (e)(7) permits an agency to maintain records describing an individual's exercise of First Amendment rights if the information is "pertinent to and within the scope of an authorized law enforcement activity." For the reasons stated in our discussion of the law enforcement purpose underlying the investigative records challenged by Doe, we find that this "law enforcement activity" exception applies to those records.

### III. CONCLUSION

For the foregoing reasons, the District Court's judgment is affirmed in part and reversed in part, and the case is remanded to the District Court for further proceedings consistent with this opinion.

*So ordered.*

SENTELLE, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's holdings in this case, with the exception of the majority's decision to remand to the District Court the question of whether the FBI may exempt its Letterhead Memorandum ("LHM") from the requirements of the Privacy Act under subsections (j) and (k). Because that question is one of law, rather than fact, I believe it is the role of this Court to determine whether the LHM is exemptible under the statute, and whether the FBI acted reasonably in exempting the LHM given the rationales it has provided. Moreover, upon addressing these questions, I believe the LHM is exemptible, and was properly exempted by the FBI under its existing regulations.

As the majority discusses, the Privacy Act gives an agency the authority to pass regulations exempting a system of records from various provisions of the Act—including, *inter alia*, those record systems consisting of "information compiled for the purpose of a criminal investigation ... and associated with an identifiable individual," 5 U.S.C. § 552a(j)(2)(B), and those systems

containing "investigatory material compiled for law enforcement purposes, other than material within the scope of subsection (j)(2)," 5 U.S.C. § 552a(k)(2). In accordance with these provisions, the FBI passed regulations exempting its Central Records System ("CRS") from subsection (d), under which appellant presently seeks to amend his file and the LHM. 28 C.F.R. § 16.96(a)(1).

As this Court has held previously, an agency may exempt its records from the Privacy Act only if those materials are made exemptible by the statute. *Vymetalik v. FBI*, 785 F.2d 1090, 1095 (D.C.Cir. 1986). Thus, we must determine whether the LHM is in fact exemptible under subsections (j) and (k). In making this determination, I believe we are guided by the Supreme Court's decision in *FBI v. Abramson*, 456 U.S. 615, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982). As the majority notes, that case held that Exemption 7 of the Freedom of Information Act ("FOIA"), exempting from disclosure requirements material compiled for law enforcement purposes, "is reasonably construable to protect that part of an otherwise non-exempt compilation which essentially reproduces and is substantially the equivalent of all or part of an earlier record made for law enforcement uses." 456 U.S. at 625, 102 S.Ct. at 2061. I believe this conclusion is equally valid with regard to the exemptions from the Privacy Act provided for in subsections (j) and (k).

The majority interprets *Abramson* as standing for the proposition that "information contained in a document qualifying for subsection (j) or (k) exemption as a law enforcement record does not lose its exempt status when recompiled in a non-law enforcement record if the purposes underlying the exemption of the original document pertain to the recompilation as well." Maj. Op. at 1356. In *Abramson*, the majority explains, the purpose of FOIA was to protect the confidentiality necessary for effective law enforcement, while providing public access to government documents. In the context of a FOIA request, any confidentiality would be defeated were

1362

a summary of law enforcement materials found to be non-exempt.

Although the majority believes the same rationale underscored the Privacy Act exemptions at issue here, it argues that the rationale does not apply in the present case, as the material has already been disclosed. Thus, it relies instead on the FBI's rationale for exempting the CRS—that a continual obligation to revisit and amend records poses an "impossible administrative and investigative burden." Maj. Op. at 1357, quoting 28 C.F.R. § 16.96(b)(2)(iii).

The majority argues that this rationale is an insufficient justification for exempting the LHM, citing the FBI figures indicating that, of 2.3 million name check requests processed in 1985, only 4,786 were made for non-law enforcement purposes. Maj. Op. at 1358, citing OFFICE OF THE ATTORNEY GENERAL, U.S. DEPARTMENT OF JUSTICE, ANNUAL REPORT OF THE ATTORNEY GENERAL OF THE UNITED STATES, 1985, at 51 (1986). Given this information, the majority concludes that the record is insufficient to allow us to conclude that the LHM is exempt under subsections (j) and (k). Accordingly, the majority remands the issue for the District Court to determine "whether the likely burden to the FBI from processing amendment requests *involving non-law enforcement records containing law enforcement information* is sufficient to justify exempting such documents from the Act's amendment provisions." Maj. Op. at 1358 (emphasis in original).

Interestingly, the majority goes on to note, in rejecting appellant's contention that the FBI must look to the administrative and investigatory burden posed by each *individual* amendment request, that "[t]he FBI's exemption regulation clearly refers to the *cumulative* burden that the FBI would face were it required to undergo a thorough review of the merits of every amendment request that it received, and to amend each of those records that it determined to be inaccurate or outdated." Maj. Op. at 1359 (emphasis in original). Thus, the majority on the one hand recognizes that the FBI must generalize in order to function, but on the other defines "non-law

enforcement records containing law enforcement information" as a discrete group of records requiring a separate justification in order to warrant exemption.

I believe this approach is inconsistent with the deference this Court shows both to Congress and to an administrative agency's application of its regulations. Because Congress left open the purposes and means of exemption by delegating the process of exemption to the agency, the majority imputes the agency's justification for exemption to Congress. *See* Maj. Op. at 1357. Given this justification, it appears to be a reasonable interpretation of the statute to find that amendment of summarizations of exempt materials would be burdensome in the same way as would be amendment of the exempt materials themselves. Indeed, were we to hold otherwise, we would risk creating a means of circumventing the exemption; a name check request could create an opportunity for amendment that would otherwise remain unavailable. Moreover, the majority points to no statutory authority indicating that we must look to the administrative and investigatory burden caused by non-law enforcement name checks alone. Rather, we need only find, as did the *Abramson* Court, that the exemptions at issue here are "reasonably construable" to include the LHM. Given the FBI's justification for the exemption, I believe they are.

The majority would have us base an issue of statutory interpretation on the FBI's 1985 figures for name check requests. Were that the case, our holding would be dependant on yearly FBI statistics; for example, were the number of employment-related name checks to increase rapidly in future years, the FBI could argue that our holding was no longer valid. As I believe the LHM is exemptible under the statute, I find the FBI's 1985 figures relevant only to determining whether the FBI was reasonable in actually exempting the LHM. An agency's application of its own regulations is reviewable under the Administrative Procedure Act only if it is arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706. *Cf. also Transcanada Pipelines Ltd. v. FERC,* 878 F.2d 401, 411 (D.C.Cir.

1989) ("this court is obliged to give considerable deference to the agency's interpretation of its own regulation, according it controlling weight unless it is plainly erroneous or inconsistent with the regulation"). While the majority clearly believes amendment of over 4,000 non-law enforcement name check requests per year does not pose an administrative or investigatory burden, we cannot say that the agency's decision to the contrary is arbitrary, capricious, or an abuse of discretion.

I therefore would find that the LHM is exemptible as a matter of law, and that the FBI acted reasonably in exempting the LHM given its perception of the administrative and investigatory burdens that would ensue were the LHM not exempt. For this reason, I would depart from the decision of the majority to remand this issue to the District Court.